# IN THE COURT OF APPEALS
# OF THE
# STATE OF MISSISSIPPI

## NO. 98-CA-00358-COA

**CRYMES G. PITTMAN, J. R. ADAMS, MARY ALLEN, FRANK H. BELL, DR. RICHARD BLOUNT, STUART C. BRODIE, BILLY CLEMENTS, JOHN H. CLEMENTS, ROY L. HATHCOCK, H. JULIAN HENDRICK, CARL HERRIN, FRANK JONES, JOHN LUCKETT, DR. J. O. MANNING, DR. MIKE MOCKBEE, RIVES NEBLETT, GUS PRIMOS, PETER K. SMITH, J. H. THAMES, DR. R. FASER TRIPLETT AND TRIPLETT INVESTMENT CLUB**

**APPELLANTS**

**v.**

**WEBER ENERGY CORPORATION AND SHIPLEY PRODUCTION COMPANY**

**APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/08/1997 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOSEPH E. ROBERTS, JR. |
| | CRYMES M. PITTMAN |
| ATTORNEYS FOR APPELLEES: | ROY H. LIDDELL |
| | KELLY D. SIMPKINS |
| | JONATHAN T. MCCANTS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF WEBER ENERGY CORP. |
| DISPOSITION: | AFFIRMED - 06/27/2000 |
| MOTION FOR REHEARING FILED: | 7/11/2000; denied 10/24/2000 |
| CERTIORARI FILED: | 11/7/2000; granted 1/25/2001 |
| MANDATE ISSUED: | |

BEFORE McMILLIN, C.J., BRIDGES, AND THOMAS, JJ.

THOMAS, J., FOR THE COURT:

¶1. Crymes G. Pittman, J. R. Adams, Mary Allen, Frank H. Bell, Dr. Richard Blount, Stuart C. Brodie, Billy Clements, John H. Clements, Roy L. Hathcock, H. Julian Hendrick, Carl Herrin, Frank Jones, John Luckett, Dr. J. O. Manning, Dr. Mike Mockbee, Rives Neblett, Gus Primos, Peter K. Smith, J. H. Thames, Dr. R. Faser Triplett, and Triplett Investment Club, hereinafter referred to collectively as "Pittman," appeal the judgment of the Chancery Court of Hinds County, raising the following assignments of error:

**I. WHETHER THE CHANCERY COURT ERRED IN CONCLUDING THAT A "JOINT**

**VENTURE" EXISTED BETWEEN THE PARTIES.**

**II. WHETHER THE "TERM SHEET AND RECEIPT" AGREEMENT IS AMBIGUOUS AND/OR IS AN INCOMPLETE AGREEMENT.**

**III. WHETHER WEBER BREACHED THE AGREEMENT AND/OR WAS RESPONSIBLE FOR MATERIAL MISREPRESENTATIONS WHICH INDUCED THE APPELLANTS INTO ENTERING THE AGREEMENT.**

**IV. WHETHER WEBER'S CLAIM IS BARRED BY THE DOCTRINE OF ELECTION OR REMEDIES.**

¶2. Finding no error, we affirm.

**FACTS**

¶3. On January 31, 1991, Weber Energy Corporation ("Weber"), a Texas corporation, and Shipley Production Company ("Shipley"), a Mississippi corporation, executed a written Joint Venture Agreement ("Agreement"). The Agreement also contained a description of four proposed oil prospects, Beverly Prospect, Johnson Prospect, Pease River Prospect, and the Weeth Prospect. The Agreement further contained a standard American Association of Petroleum Landmen, Model Form Operation Agreement, A.A.P.L. Form 610-1982. Together the two agreements embodied the two parties' previous discussions of December 18, 1990, in which Weber and Shipley agreed to become joint venturers in prospecting for oil in the Hardeman Basin. The Hardeman Basin encompassed approximately 3000 square miles in North Central Texas and Southwest Oklahoma along the Red River. Ben R. Weber signed in his capacity as president of Weber, and James E. Poole, Jr. signed as president of Shipley. Each owned a fifty percent working interest in the venture and understood, as embodied in their agreement, that they were each liable for the actual cost of the venture based on their proportional interest. In addition, the parties agreed that they would be liable "several and not joint or collective" for their obligations. The Agreement designated Weber as the operator and Shipley as the non-operator. The Agreement also contained provisions for the assignment of all or part of each joint venturer's respective interest in the venture.

¶4. Between December 1990 and January 1991, Shipley assigned varying percentages of its fifty percent working interest in the venture to the co-venturers who are the present appellants in this case. The present appellants do not account for all of the original investors, approximately thirty. Some, those not named in this suit, have entered into settlement agreements with Weber and have been subsequently released from any further liability. Shipley had each co-venturer sign a Term Sheet and Receipt agreement, herein after referred to as "Term Sheet," in which they consented to participation in the venture proportional to the percentages assigned through Shipley. The Term Sheet, in pertinent part, is as follows:

TERM SHEET AND RECEIPT

Date:_____, 19___

WHEREAS, Shipley Production Company (SPC) has agreed to purchase a leasehold interest in four Hardeman Basin horizontal drilling prospects (Exhibit A) from Weber Energy Corporation, and further has agreed to participate in the initial test well on the prospect known as the "Weeth Prospect", and

WHEREAS, (name of the co-venturer) is a co-venturer with SPC in said Hardemen Basin horizontal drilling prospects, it is agreed as follows:

1. That (name of the co-venturer) shall participate as to a (percentage) working interest in the venture, said working interest being subject to a twenty-five percent (25%) royalty burden.

2. That (name of the co-venturer) herewith pays for the land, geological, geophysical, and consulting, and the estimated drilling costs for Weeth Prospect in amounts as follows:

|  | |
|---|---|
| | $xxx |
| Land | |
| | xxx |
| Geological, geophysical, and consulting | |
| | xxx |
| Estimated drilling | |
| | $xxx |
| TOTAL: | |

3. That (name of the co-venturer) agrees to be bound by the A.A.P.L. Form 610-1982 Model Form Operating Agreement, as agreed to by SPC and Weber Energy Corporation, and that (name of the co-venturer) agrees to pay his (percentage) of costs under the agreement.

4. (name of the co-venturer) agrees that (his/her) (percentage) working interest shall be reduced by 20% after pay-out, on a prospect by prospect basis.

5. Co-venturer hereby represents that he is familiar with the risks and further represents that he is capable of bearing the financial rick associated with this venture.

6. SPC and co-venturer agree that a complete agreement setting forth the terms of their relationship is forthcoming.

7. SPC agrees to return the payments made hereunder if the operations on the Weeth Prospect are not commenced timely.

This the ___ day of _____, 19__.

¶5. Each Term Sheet was then signed by both Shipley and the co-venturer together with their respective mailing addresses and telephone numbers. Such was the state of affairs in the spring of 1991 when drilling commenced on Weeth Prospect Well No. 1. However, after three unsuccessful attempts, a fourth attempt was made, but the well failed to produce the expected results. Considerable cost overruns were incurred due to significant underground complications encountered during drilling. The prospect was eventually abandoned, and the well plugged in late April, after having failed to locate any profitable quantities of oil. The total costs in the failed prospect exceeded the estimated amounts by $197,976.15. Weber sent a letter

to Shipley advising that Weber was abandoning the venture under the terms of the Agreement. Shipley was also given the option under the Agreement to assume operations. Shipley and Pittman concurred to plug and abandon the well. On September 26, 1991, Weber, in accordance with the terms of the Agreement, submitted a final invoice to Shipley for the payment of its portion of the excess costs. Shipley in turn declined to pay the additional costs and questioned the manner in which the operations and drilling had been carried out by Weber. Weber soon filed suit against Shipley in Texas and on June 20, 1994, obtained a default judgment against Shipley for the excess costs plus interest and attorney's fees. Pittman was not included in that suit and due to Shipley's precarious financial situation, Shipley has since become bankrupt. Any recovery from Shipley remains tenuous at best.

¶6. Weber, still seeking to recover half of the cost overruns incurred under the Agreement and upon learning of the assignments made by Shipley, sent a letter to Pittman on July 7, 1992, advising Pittman that Shipley had refused to pay its share of the $197,976.15 cost overruns:

> [H]owever, the agreement between Weber and Shipley was that each party would bear 50% of the total costs involved in the reentry and other costs associated with the Joint Venture. By virtue of Shipley not honoring its agreement, Weber has been forced to incur the great bulk of the expenses of such joint venture program. That, however, was not the agreement which Weber entered into with Shipley and Weber fully expects Shipley and its assigns and transferrees to bear their share of the expense.

In response to this letter, Pittman filed a Complaint for Declaratory Judgment with the Chancery Court of Hinds County on October 8, 1992. In his complaint, Pittman sought relief from the chancery court and requested an order and determination of the rights, duties and obligations that exist between Weber and Pittman. Pittman maintains that at no time did he ever have any contact or enter into a contract with Weber and that he was "merely an investor with the Defendant Shipley Production Company."

¶7. On June 10, 1994, Weber filed a counterclaim against all co-venturers, requesting reimbursement for expenses incurred in connection with the failed prospect, pre-judgment interest, reasonable attorney's fees and all costs of court. On December 9, 1996, the matter was tried before the Honorable Denise Sweet Owens, and the court's memorandum opinion and order was filed on May 23, 1997. The final order was subsequently entered on July 8, 1997. On January 30, 1998, the chancery court denied Pittman's motion for a new trial and reconsideration. Following judgment in favor of Weber, Pittman now appeals to this Court.

## ANALYSIS

¶8. Our standard of review on declaratory judgments is well settled. "A declaratory judgment sets out the law and is binding as to the rights of the parties." *Hall v. Bowman*, 749 So. 2d 182, 183 (¶5) (Miss. Ct. App. 1999). "It is a well-settled principle that the supreme court is the ultimate expositor of the law of this State." *Id.* (citing *UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc.*, 525 So. 2d 746, 754 (Miss. 1987)). We, therefore, as an appellate court, conduct a *de novo* review on questions of law. *Id.*; *C.E. Tucker v. Hinds County, Mississippi Power & Light Co.*, 558 So. 2d 869, 872 (Miss. 1990).

## I.

## WHETHER THE CHANCERY COURT ERRED IN CONCLUDING THAT A "JOINT

VENTURE" EXISTED BETWEEN THE PARTIES.

## II.

## WHETHER THE "TERM SHEET AND RECEIPT" AGREEMENT IS AMBIGUOUS AND/OR IS AN INCOMPLETE AGREEMENT.

¶9. The analysis of issues I and II are interwoven and will be addressed collectively. It is argued by Pittman that the chancery court erred in concluding that a joint venture existed between Weber and Pittman. Pittman argues that Weber did not even know the identities of the co-venturers nor had the co-venturers ever negotiated or entered into any kind of contract with Weber. Pittman maintains that this fact supports a finding that no joint venture ever existed between Weber and Pittman. Pittman also argues that the existence of a joint venture between Weber and Pittman cannot be found since Pittman neither participated in the drilling operations nor participated in any of the planning. In short, Pittman argues that the right of mutual control of the operations never existed nor was even attempted to be exercised by Pittman against Weber. Pittman maintains that without any right of mutual control over the operations, there can be no joint venture. In support of this argument, Pittman contends that the Term Sheets signed by all of the co-venturers were ambiguous and incomplete and that all of the co-venturers looked forward to a future agreement, which they never had the occasion to sign. They maintain that the future agreement would have set forth their true intentions and the parameters of their relationship as mere investors, whose liability was strictly limited to their initial investment and nothing more. However, no written documentation, either in draft form or as a completed agreement, has ever been brought forth to support Pittman's claims.

¶10. Pittman seeks to use parol evidence to contradict the terms and conditions as set forth in the Term Sheet. Pittman relies solely on the oral testimonies given by the co-venturers and Shipley himself, which if accepted as true would serve to contradict or change the written Term Sheet signed by each co-venturer. The Term Sheet clearly states that each co-venturer "agrees to be bound by the A.A.P.L. Form 610-1982 Model Form Operating Agreement, as agreed to by SPC and Weber Energy Corporation, and that [each co-venturer] agrees to pay his [percentage] of costs under the agreement."

¶11. The parties involved in this matter are to be considered anything but lay persons unskilled, as it were, in assessing a venture such as this and the risks involved. Many of the co-venturers are attorneys, doctors, business operators, and investment club members who by reason of their respective fields and professions should be, at least to some degree, knowledgeable of the relationship which they entered. As one commentator has noted, "[N]onoperators are . . . rarely lacking either in financial resources or in formal education. With the possible exception of some 'promoted' prospects, . . . the parties to an operating agreement are either oil and gas companies or experienced investors." Ernest E. Smith, *Joint Operating Agreement Jurisprudence*, 33 Washburn L.J. 834, 840 (Summer 1994).

¶12. A brief review of the pertinent terms as contained in the Term Sheet is in order. In each Term Sheet, each investor was aptly designated as a "co-venturer:" "WHEREAS, [name of the co-venturer] is a *co-venturer* with SPC in said Herdemen Basin horizontal drilling prospects. . . ." (emphasis added). We find this designation to be persuasive in establishing that each co-venturer knew or should have known the nature of the relationship they were entering when they each signed a Term Sheet. We likewise find the term co-venturer to be synonymous with joint adventurer and joint venturer.

¶13. A joint venture can be readily defined as "[a] legal entity in the nature of a partnership engaged in the

joint undertaking of a particular transaction for mutual profit [where] generally all contribute assets and share risks." BLACK'S LAW DICTIONARY 839 (6th ed. 1990). Furthermore, "[i]t requires a community of interest in the performance of the subject matter, a right to direct and govern the policy in connection . . . and duty, which may be altered by agreement, to share both in profit and losses." *Id*.

¶14. Our Supreme Court first addressed the nature of a "joint adventurer" relationship in detail in *Sample v. Romine*, 193 Miss. 706, 8 So. 2d 257, 260-61 (1942):

> While perhaps no exact definition of a joint adventure can be given, nor can a general rule be laid down by which the question as to what amounts to a joint adventure can be answered, the answer in each case depending on the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. . . . A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly, and, more particularly, as an association of two or more persons to carry out a single business enterprise for profit . . . an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge. [J]oint adventure has been defined as an association of two or more persons to carry out a single business enterprise for profit. A federal court said Joint adventure exists when two or more persons combine in joint business enterprise for their mutual benefit with understanding that they are to share in profits or losses and that each is to have voice in its management. . . . The contributions may be in money, materials, services- something promotive of the enterprise.

From that case sprung the basic requisites needed before a "joint venture" can be found to exist. The *Sample* court held that "[a]n agreement, expressed or implied, for sharing the profits is essential to a joint venture. . . ." *Id*. at 261. This reasoning was later restated in *Hults v. Tillman*, 480 So. 2d 1134, 1143 (Miss. 1985), in holding that a "joint venture" must also include "an intention of the parties to be associated together as general partners, or for the more limited duration of a joint venture." Returning to the *Sample* court's reasoning, "[t]here must be a joint propriety interest and right of mutual control." *Sample*, 193 Miss. at 709, 8 So. 2d at 261. The "right of mutual control" requirement serves as the foundation on which Pittman has built his argument. We will address this requirement in greater detail later in our analysis.

¶15. The *Sample* court went on to add, in regard to an expression of how losses are to be allocated, that:

> However, there need be no specific agreement to share in the losses, and if the nature of the undertaking is such that no losses other than those of time and labor in carrying it out are likely to occur, an agreement to share the profits may stamp it as a joint adventure, although nothing is said about sharing the losses.

*Id.*

¶16. The express terms of the Term Sheet clearly sets forth an agreement for sharing the profits, this much would be tenuous to dispute:

> That (name of the co-venturer) shall participate as to a (percentage) working interest in the venture, said working interest being subject to a twenty-five percent (25%) royalty burden.
>
> * * *
>
> (name of the co-venturer) agrees that (his/her) (percentage) working interest shall be reduced by 20%

after pay-out, on a prospect by prospect basis.

¶17. Not only does the Term Sheet include the necessary language for establishing each co-venturer's share of the profits, it likewise states, in unequivocal terms, that each co-venturer shall have a "working interest" based on his or her percent of their assignment. In reaching its decision, the lower court, citing *OXY, USA, Inc. v. Colorado Interstate Gas Co.*, 883 P.2d 1216 (Kan. Ct. App. 1994), correctly stated that a "'working interest' is virtually synonymous with the term 'leasehold interest.' The working interest owner bears the expense of exploration, drilling, and producing oil or gas. . . . It is contrasted with the landowner's royalty interest, which bears no part of the production expense." *OXY, USA, Inc.*, 883 P.2d at 1224. *See also Sample*, 8 So. 2d at 261.

¶18. Pittman concedes an obvious community of interest in the ultimate goal of successfully locating and extracting oil. He further concedes that the Term Sheet expressly provides for the allocation of profits. However, where Pittman contests the conclusion that a joint venture did in fact exist lies within the "mutual right of control" requirement and in any agreement that losses are to be allocated based on the initial percentage each co-venturer was assigned. Pittman argues that the Term Sheet did not embody the final and complete agreement between Pittman and Shipley. Pittman agues that the Term Sheet expressly states that "SPC and co-venturer agree that a complete agreement setting forth the terms of their relationship is forthcoming." It is within this "future agreement" that Pittman claims he and Shipley were intending to specifically limit their respective liabilities to their initial investments without further liability on cost overruns or additional expenses should they arise. He further argues that at no time were the co-venturers ever in a position to exercise any mutual right of control because there simply was no agreement between the co-venturers and Weber to establish just such a right. We find these arguments to be unpersuasive in light of the express terms contained in the Term Sheet.

¶19. Our law on the admission of parol evidence is clear, and we have stated that it is "[o]ne of the fundamental principles of contract law is that parol evidence will not be received to vary or alter the terms of a written agreement that is intended to express the entire agreement of the parties on the subject matter at hand." *Housing Auth. of Laurel v. Gatlin*, 738 So. 2d 249, 251 (¶10) (Miss. Ct. App. 1998). *See also Grenada Auto Co. v. Waldrop*, 188 Miss. 468, 469, 195 So. 491, 492 (1940); *Perrault v. White Sewing Mach. Co.*, 157 Miss. 167, 176, 127 So. 271, 274, (1930); *Edrington v. Stephens*, 148 Miss. 583, 585, 114 So. 387, 389 (1927); *Kerr v. Calvit*, 1 Miss. 115, 118 (1822). "[P]arole evidence is not admissible to contradict, vary, alter, add to, or detract from, the instrument." *Allen v. Allen*, 175 Miss. 735, 741, 168 So. 658, 659 (1936). Furthermore, we find no ambiguity or incompleteness, as argued by Pittman, in the Term Sheet.

¶20. The Term Sheet includes additional terms and language indicating that a joint venture did exist. The agreement stated that the drilling costs were estimations and as such should have indicated that additional costs were possible. The agreement further contained a clause in which the co-venturer represented that he/she was familiar with the risks involved and that he/she was financially capable of bearing the financial risk associated with the venture. It would seem illogical for a co-venturer to have been required to make such a representation when in making the agreement, the necessary funds were due and paid at that time. We say this in addition to our previous analysis concerning the terms "co-venturer" and "working interest."

¶21. More importantly and most fatal to the arguments advanced by Pittman is the following reference contained within the Term Sheet, which we find persuasive in resolving the matter:

That (name of the co-venturer) agrees to be bound by the A.A.P.L. Form 610-1982 Model Form Operating Agreement, as agreed to by SPC and Weber Energy Corporation, and that (name of the co-venturer) agrees to pay his (percentage) of costs under the agreement.

¶22. This clause specifically references the parties to a comprehensive 1982 Model Form Operating Agreement and states that the co-venturer agrees to be bound to that agreement "as agreed to by SPC and Weber." The conditions set forth in the Operating Agreement directly contradict the arguments advanced by Pittman on the matter of whether the parties agreed to an allocation of losses and whether there existed a "right of mutual control."

¶23. Under the Operating Agreement, as agreed to by Shipley and Weber, there is a specific provision for the allocation of losses. Article III, Interests of the Parties, subparagraph B, of that agreement states as follows:

B. Interests of Parties in Costs and Production: Unless changed by other provisions, *all costs and liabilities incurred in operations* under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".

(emphasis added).

¶24. Furthermore, with respect to any "right of mutual control," the express terms of the Operating Agreement more than amply provide that non-operators do have the final authority in a number of managerial decisions effecting the venture. Article V, Operator, subparagraph B.1, provides for the removal of the operator, Weber, in specific situations by the non-operators, Pittman: "Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit 'A' . . . ." In regard to drilling decisions, Article VI, Drilling and Development, subparagraph B.2, provided measures in which the non-operators, Pittman, may propose additional drilling within the contract area. Further managerial decisions are available to the non-operators, Pittman, in Article VII, Expenditures and Liability of Partners, subparagraph D, wherein upon the unanimous "consent of all parties" the prospected wells may be "drilled or deepened" and "reworked or plugged back." Article VII also prohibits Weber from undertaking any additional project, not previously authorized by the non-operators, which could reasonably exceed an additional $25,000. It also allows the non-operator to request an "information copy" from the operator for any additional project that exceeds $10,000. Finally, Article X, Claims and Lawsuits, sets a ceiling of $25,000 on settlements that Weber could enter into without obtaining authority from the non-operators.

¶25. In so agreeing to be bound by the Operating Agreement, as agreed to by Shipley and Weber, each co-venturer necessarily obtained the "right of mutual control" as outlined and set forth in that agreement. Pittman's argument that he never received a copy of the Operating Agreement is for naught. The venture was a joint venture between Weber and, through Shipley, Pittman. We agree, as was found by the lower court, that Shipley kept the co-venturers adequately informed of the progress in the venture from which to exercise their rights under the Operating Agreement. Their decision not to exercise those rights and to acquiesce in the decision to abandon the Weeth Prospect Well No. 1 does not change the fact that right of mutual control did in fact exist. The lower court also concluded that "given the large number of [co-venturers,] it would be unreasonable to expect that all of them should have participated in the daily

management of this enterprise." We agree. It has been said that "the fact that these managerial rights in nonoperators are limited relative to the operator's broad powers does not distinguish the JOA from other types of joint ventures, where the venturers entrust full operational control to one of the participants." Smith, *supra*, at 844. These assignments of error are without merit.

### III.

### WHETHER WEBER BREACHED THE AGREEMENT AND/OR WAS RESPONSIBLE FOR MATERIAL MISREPRESENTATIONS WHICH INDUCED THE APPELLANTS INTO ENTERING THE AGREEMENT.

¶26. Pittman argues that even if it were concluded that a joint venture did exist between Weber and the co-venturers, no conceivable right of recovery against them should be allowed based on "material misrepresentations inducing the investors into making the investment" that were allegedly made. Pittman maintains that the level of risk involved was everally understated by Weber, through Shipley, to the co-venturers, and that despite being told that the drilling would be conducted in a specific direction to optimize their chances of hitting oil, the drilling was in fact conducted in an entirely different manner.

¶27. The lower court found these assertions to be unsupported by the evidence. In opposition to the assertions made by Pittman concerning the manner in which the drilling was completed, Tom Armstrong, the on-site geologist, testified that the theory behind drilling horizontally rather than vertically was that the Hardeman Basin sat atop a large dome-like formation of possible oil reserves running more vertically than horizontally. Normally vertical drilling would be appropriate, but due to the particular geological formations in the Weeth Prospect, horizontal drilling was more desirable. Thus by first drilling vertically to a desired depth and then turning the drill bit horizontally, the co-venturers were optimizing their chances for finding oil. Armstrong testified that oil reserves are found in porous rocks and are the result of a dolomitization process. The dome, naturally, would be surrounded by a fault line, and the fault line defines the perimeter of the dome, thus drilling in any horizontal direction would have made no difference since they did drill into and beyond the fault line. This, Armstrong testified, tested their idea but nevertheless proved their prospect fruitless since the samples obtained from the well failed to produce incremental increases in the percentages of dolomite as they approached and passed through the fault.

¶28. We have reviewed the record and are satisfied with the lower court's findings. The Hardeman Basin has produced wells, as the testimony supports, with sufficient quantities of oil to outweigh the costs of production; however, not every well drilled will produce those results. Such was the case in the Weeth Prospect Well No. 1. The fact that this venture produced a "dry hole" does not necessarily infer, on its own, that Weber misrepresented the risks involved or was negligent in the operational aspects of the drilling. The evidence produced at trial simply does not support the arguments advanced. This assignment of error is without merit.

### IV.

### WHETHER WEBER'S CLAIM IS BARRED BY THE DOCTRINE OF ELECTION OR REMEDIES.

¶29. Pittman argues that Weber has previously made an "election of remedies" under the law and is therefore barred from proceeding with its action against the co-venturers in this case. Pittman argues that by

virtue of the default judgment obtained against Shipley in Texas, Weber made an election and is barred under the doctrine of election of remedies from now seeking further compensation from the co-venturers. Pittman argues that it was tantamount to the success of Weber's action to have included the co-venturers in the Texas proceedings. We disagree.

¶30. Under the election of remedies doctrine, certain elements must be met before a defense under the doctrine is allowed: 1) that there exist two or more remedies; 2) that there be an inconsistency between the two remedies: and 3) that a choice have been made between the two. *O'Briant v. Hull*, 208 So. 2d 784, 786 (Miss. 1968); *see also Aetna Casualty & Surety Co. v. Berry*, 669 So. 2d 56, 71 (Miss. 1996). "[T]he failure to secure satisfaction by means of the remedy adopted does not, it has been held, take the case out of the doctrine of election." *Aetna*, 669 So. 2d at 72. The failure to include the co-ventures in the Texas proceedings against Shipley, and Shipley alone, does not preclude a suit in Mississippi against the other co-ventures. The lower court, in addressing this issue, correctly stated that this case centers around the "liability of the cost overruns" and that there was "only one remedy contemplated, namely, full payment." This liability was individually borne by the respective co-venturers. The goal of the doctrine is to prevent a double redress for a single wrong. 25 AM. JUR. 2D *Election of Remedies* § 2 (1986). Weber was a joint venturer with multiple partners who are each liable "severally" for their pro rata share of the cost overruns. The active pursuit of its rights against them, whether collectively or individually, does not render its rights barred under the election of remedies doctrine so long as the compensation sought is limited to each co-venturer's respective liabilities. These liabilities are set forth in the Term Sheets and Operating Agreement. No double redress has occurred under the facts of this case, and we see no inconsistencies between the two proceedings. The election of remedies doctrine is inapplicable in this case. This assignment of error is without merit.

¶31. **THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**McMILLIN, C.J., SOUTHWICK, P.J., AND MOORE, JJ., CONCUR. BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND IRVING, J. LEE AND PAYNE, JJ., NOT PARTICIPATING.**

**BRIDGES, J., DISSENTING:**

¶32. With respect to my colleagues in the majority, I would reverse the decision of the Hinds County Chancery Court in this case, concluding that the trial court erred in its decision to hold the Appellants responsible for a share of the cost overruns in the Weeth Prospect.

¶33. On the issue of whether the Appellants were joint venturers with Weber Energy Corporation, I respectfully disagree with the majority. I find that the Appellants, having no contact with Weber, having no knowledge of the terms of the contract between Weber and Shipley Production Company, having never been given a copy of the Operating Agreement subject to their initial agreement with Shipley and having no mutual control over the drilling, are not obligated to Weber for the excessive expenses incurred in Weber's continuous attempts to extract oil from Weeth Prospect Well No. 1.

¶34. The joint venture that existed in this case between Weber and Shipley, I find, did not extend to the Appellants in this case. There was never any type of agreement between Weber and Appellants here.

According to the language of the Joint Venture Agreement between Weber and Shipley, Weber expressly removed itself from any form of contact with any assignees or investors. Further, it appears from the language of the agreement that Weber never intended to have any type of contractual relationship with any assignees or investors. It is stated in the Joint Venture Agreement that Weber may only bill Shipley; Weber shall not make assignments for Shipley or interfere therewith; Weber shall only supply information and notices of the project to Shipley, not Shipley's assignees; Weber may look *solely* to Shipley for any commitments, decisions or elections under the Operating Agreement; and Weber is only responsible for disbursing proceeds checks to Shipley, not Shipley's assignees. (See Section XIII. of Joint Venture Agreement). Weber placed all of the responsibilities regarding assignees in the hands of Shipley, and Shipley only. This agreement clearly establishes that Weber has no obligation to Appellants, and therefore there is no bargained-for exchange between Weber and Appellants in any way, shape or form.

¶35. I find the Appellants' argument persuasive regarding the law dealing with binding agreements. There was insufficient evidence of a complete agreement between Shipley and Appellants. The Term Sheet and Receipt Agreement represented that it was, on its face, not the final agreement of the parties. This agreement represented the parties' intent to form a binding agreement which would be "forthcoming." The Appellants here believed that the agreement wasn't binding until all of the final terms and conditions were expressed in a completed and final document to be signed by them. Therefore, Appellants suffered great confusion when they were threatened by Weber, a company which they had never had any previous knowledge of or contact with regarding this project. Appellants were astonished when Weber, out of nowhere, purported to have a claim against Appellants because Shipley had become insolvent. The confusion of the Appellants as to the Term Sheet and Receipt Agreement with Shipley presents an ambiguity that, in my opinion, must be addressed. There was no apparent meeting of the minds here. The Appellants were never given any indication that they could and would be held responsible for Shipley's default on a completely different agreement with an entirely different company. The Appellants are correct that, in clearing up any confusion created by an ambiguity in an agreement, it is necessary to look to parol evidence to determine the intent of the parties. *Knight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989). The intent of the Appellants and Shipley has been made clear here by use of testimony under the parol evidence rule. Appellants testified that they were only obligated up to the amount of their original investment, nothing more. They also testified that they were told that the worst case scenario would be that the project would fail and they would be reimbursed for the percentage of their investment. Shipley's president corroborated this testimony. The opposing testimony by Weber is not corroborated, however.

¶36. Since there was no intent of the Appellants to enter into any agreement with Weber, there was, in fact, no agreement whatsoever with Weber. The use of the Term Sheet and Receipt Agreement was simply an acknowledgement by Appellants that they were willing to enter into an agreement with Shipley after the terms of the agreement were settled in a complete and final document. They gave their money to Shipley in reliance of this. Shipley never drafted a final agreement. Weber was not, in any way, involved in this entire process, and therefore was never a party to any type of agreement with the Appellants. This makes Weber in no position to demand anything from Appellants pursuant to a contract that never existed.

¶37. Finally, I find the Appellants' argument regarding lack of mutual control to be persuasive. The *Sample v. Romine* decision makes clear that a joint venture between parties must include the right of mutual control over the endeavor that is the subject of the agreement. 193 Miss. 706, 8 So. 2d 257 (1942), *modified*, 193 Miss. 706, 10 So. 2d 346 (1942). Here, I agree with Appellants that they had no right of mutual control over the drilling process. Weber, as stated in the Joint Venture Agreement with Shipley, had no

intention of ever having contact with any of Shipley's assignees or transferees. If Weber expected that Appellants would be co-venturers in this agreement, I would infer that it would be absolutely sure that Appellants were informed of all decisions and events taking place with the Weeth Prospect. Appellants were not only not informed, but they were never asked by Weber or Shipley about their opinions as to the drilling process. Weber never even bothered to make certain of the identities of these assignees, much less give the Appellants the opportunity to exercise any type of control over the project. "A 'joint adventure' is an enterprise undertaken by several persons jointly, and more particularly as an association of two or more persons to carry out a single business enterprise for profit for which purpose they combine their property, money, effects, skill, and *knowledge*." *Sample*, 8 So. 2d at 260 (emphasis added). Appellants were never made aware of what was going on with the project and were therefore, never in a position to share their knowledge by making determinations in the process of the drilling. In the absence of the ability to take advantage of any mutual control, I find that Appellants must not have been involved in a joint venture with Weber.

¶38. For the foregoing reasons, I would reverse the decision of the trial court and find in favor of Appellants.

**KING, P.J., AND IRVING, J., JOIN THIS SEPARATE OPINION.**