(883 P.2d 1216)
No. 70,826

OXY USA, INC., *Appellee*, v. COLORADO INTERSTATE GAS COMPANY, *Appellant*, and VIRGIL K. WATSON, JEFFREY J. WATSON, JOHN D. WATSON, KIM W. WATSON, and VIRGIL E. WATSON, *Appellees*.

Opinion filed November 4, 1994.

*Virginia G. Amend,* of Colorado Interstate Gas Company, of Colorado Springs, Colorado, and *Thomas J. Wilder* and *James R. McEntire,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for the appellant.

*Arthur B. McKinley,* of Sharp, McQueen, McKinley, Dreiling & Moran, P.A., of Sublette, and *Michael P. Dreiling,* of the same firm, of Liberal, for the appellees.

Before LEWIS, P.J., RULON, J., and TERRY L. BULLOCK, District Judge, assigned.

LEWIS, J.: OXY USA, Inc., (Oxy) instituted this declaratory judgment action against Colorado Interstate Gas Company (CIG) and Virgil K. Watson, Jeffrey J. Watson, John D. Watson, Kim W. Watson, and Virgil E. Watson (Watsons). Oxy asked for a determination that CIG was responsible for the payment of one-half of the costs of producing gas from a certain gas well in Haskell County, known as the "Watson E" gas well. Oxy and CIG both filed motions for summary judgment. The trial court held in favor of Oxy, and CIG appeals. While the Watsons are defendants in this action, on appeal they are united in interest with Oxy and seek affirmance of the decision of the trial court.

## FACTUAL BACKGROUND

The roots of this controversy stem from the year 1955. In that year, Oxy's predecessor in interest, American Gas Production Company, held an oil and gas lease on the north half of section 24, township 30 south, range 32 west in Haskell County. Subsequently, Oxy succeeded to the interest of American Gas Production Company. In this opinion, "Oxy" will refer to American Gas Production Company as well as Oxy. The unleased minerals in and under the south half of 24-30-32 were owned by the Watsons.

In 1955, Oxy and the Watsons entered into an agreement for the production of gas from all of section 24-30-32 in Haskell County. The parties reduced their understanding to writing in a gas operating agreement (GOA) which was dated January 4, 1955. The GOA was never recorded in Haskell County.

The record does not indicate that the real estate in question was the subject of the usual oil and gas lease. It is our opinion that the GOA stands in the same basic relationship to the parties as would an oil and gas lease.

The GOA between Oxy and the Watsons designated Oxy as the operator of any gas well produced. As operator, Oxy was to commence drilling a well at a specifically designated location and was to operate and produce gas from the well if drilling operations were successful. The drilling operation resulted in a producing gas well, and Oxy remains the operator of the Watson E gas well on the real estate described in the GOA. The agreement defines the interest of the parties as follows:

"The interests of the parties in and to all the gas produced and saved from the Contract Area and in and to the equipment to be installed therein and thereon shall be as follows:

[Oxy]—50 per cent
[Watsons]—[50] per cent

*and all costs, expenses, and liabilities accruing or resulting from the development and operation of said Contract Area pursuant to this agreement shall be determined, shared, and borne by the parties hereto in said proportions.*" (Emphasis added.)

There are two additional provisions in the GOA which are particularly important in resolving the issues in this lawsuit:

## "IX. CONTROL AND COST OF OPERATION

"Operator shall have full control of the premises subjected hereto and, subject to the provisions hereof, shall conduct and manage the development and operation of said premises for the production of gas for the joint account of the parties hereto. Operator shall pay and discharge *all costs and expenses incurred pursuant hereto, and shall charge each of the parties hereto with its respective proportionate share upon the cost and expense basis provided in the Accounting Procedure attached hereto,* marked Exhibit 'B', and made a part hereof; provided however, if any provision of said Exhibit 'B' conflicts with any provision hereof, the latter shall be deemed to control. Each party hereto other than Operator will promptly pay Operator such costs as are hereunder chargeable to such party. Unless otherwise herein provided all production of gas from said land, subject to the payment of applicable royalties thereon, and all materials and equipment acquired pursuant hereto, shall be owned by the parties hereto in the respective proportions as set out herein. Operator shall at all times keep the joint interest of the parties hereto in and to the leases and equipment thereon free and clear of all labor and mechanics' liens and encumbrances.

. . . .

"XIII. OPERATOR'S LIEN

*"Operator shall have a lien upon the interest of each Non-Operator which is subjected to this agreement, the gas therefrom, the proceeds thereof and the materials and equipment thereon and therein to secure Operator in the payment of any sum due to Operator hereunder from any such Non-Operator. The lien herein provided for shall not extend to any royalty rights attributable to any interests subjected hereto."* (Emphasis added.)

The agreement also provides that it "shall extend to and bind the respective heirs, executors, administrators, successors, and assigns of the parties hereto."

In addition to receiving a share of the working interest as provided in the GOA, the Watsons were also entitled to receive a one-eighth royalty pursuant to the provisions of that agreement.

On August 8, 1955, the parties entered into a "Declaration for Unitized Operations." This instrument was filed of record in Haskell County on the date set forth above and makes several references to the GOA. Although the GOA was not recorded, the record clearly shows that CIG knew of its existence and cannot claim otherwise.

CIG was and is the pipeline company. In essence, it has been purchasing the gas produced from the Watson E gas well and should be quite familiar with the operation.

As near as we can tell, the operation of the Watson E gas well went smoothly and without significant dispute for over 30 years. In 1986, however, CIG filed suit against the Watsons, alleging that they had illegally diverted natural gas from CIG's pipeline to operate their irrigation well and tailwater pump motors.

In 1987, CIG and the Watsons entered into a settlement agreement resolving the lawsuit described above. In the settlement agreement, the Watsons agreed to do the following:

"Defendants, joined by their respective spouse and their parents, Virgil E. Watson and Vera Watson, *by the form of Assignment,* attached hereto and marked 'Exhibit A' *covenant to assign* for a term of ten (10) years, all of their right, title, claim, interest, equity and estate in and to all oil, gas and *all other mineral royalty, working interest payments, rents and all other payments made on or in lieu of production from the 'Watson E' gas unit well, or any replacement, addition or substitution thereof* . . . ."

In order to implement the terms of their settlement agreement, the Watsons executed and delivered to CIG a "Mineral Income Assignment" (MIA). This assignment reads as follows:

"MINERAL INCOME ASSIGNMENT
(Quitclaim)

"THIS INDENTURE made and executed this 15th day of April, 1987, BY AND BETWEEN:

VIRGIL E. WATSON and VERA WATSON, husband and wife; JEFFREY JOE WATSON and LINDA WATSON, husband and wife; JOHN DOUGLAS WATSON, a single man; VIRGIL KEVIN WATSON and ALLISON WATSON, husband and wife; and KIM WHITTAKER WATSON and DANA R. WATSON, husband and wife, all of Haskell County, Kansas, hereinafter identified as 'ASSIGNORS'

AND

COLORADO INTERSTATE GAS COMPANY, a Delaware Corporation, of El Paso County, Colorado, hereinafter identified as 'ASSIGNEE'

WITNESSETH:

*Assignors, for themselves, their heirs and assigns, do hereby grant, bargain, convey and assign unto Assignee, its successors and assigns,* all of their joint and several right, title, claim and interest, in and to all oil, gas and all other mineral royalty payments, *working interest payments*, rents and all other payments due them on or in lieu of production from the 'Watson E' gas unit well under the Declaration for Unitized Operations filed August 8, 1955, recorded in Oil and Gas Book 14 at page 571, in the office of the Register of Deeds of Haskell County, Kansas, and/or any and all replacement, substitute or additional wells produced on, and under said agreement or any subsequent agreement or lease, covering the following described real estate situate[d] in Haskell County, Kansas, to-wit:

South Half (S/2) of Section Twenty-four (24), Township Thirty (30) South, Range Thirty-two (32) West of the 6th P.M.

TO HAVE AND TO HOLD *unto Assignee*, its successors and assigns, for a term of ten (10) years from the date hereof. Upon the expiration of said term all right, title, claim and interest conveyed and *assigned* hereunder shall revert to *Assignors*, in the same fractional ownership as now held, their respective heirs or assigns.

*This Assignment is made without warranty of title, except Assignors* warrant that they have made no other conveyance, assignment or pledge of such mineral income in conflict herewith.

IN WITNESS WHEREOF, *Assignors* have hereunto set their hands and caused this *Assignment* to be duly executed the day and year first above written." (Emphasis added.)

The assignment was signed and acknowledged by all of the Watsons and was recorded in Haskell County in 1987 and again in 1993.

After the assignment was recorded, Oxy continued to operate the Watson E gas well and CIG continued to purchase the gas produced from that well. However, CIG refused to pay any part of the costs of producing the gas from the well. Oxy filed this lawsuit asking the trial court to determine whether CIG or the Watsons were responsible for payment of 50 percent of the costs of production. Oxy alleges that at the time it filed this action, it was owed operating costs of $14,588.25.

Both Oxy and CIG filed motions for summary judgment. Both parties agreed that there were no genuine issues of material fact to be determined and that the matter was ripe for summary judgment.

The trial court ruled in favor of Oxy. It held that what CIG got from the Watsons was an assignment of the Watsons' working interest in the gas well. The court determined that the working interest assigned was one-half of the production income less one-half of the production expense. The court determined that CIG was responsible for one-half of the production expenses of the well. The court did not determine the amount owed to Oxy by CIG, nor did it determine what percentage of the production income was royalty income as compared to working interest income.

## STANDARD OF REVIEW

The answer to the issues presented is found in the various agreements entered into between the parties. When there is no genuine issue of material fact and there are no ambiguities, a written document can properly be construed in ruling on a motion for summary judgment. *Wulf v. Shultz*, 211 Kan. 724, 731, 508 P.2d 896 (1973).

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. [Citations omitted.]" *Patterson v. Brouhard*, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306, 756 P.2d 416 (1988).

In this action, there are no genuine issues of material fact. The GOA, the settlement agreement, and the MIA are not afflicted with ambiguities. See *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988).

We must determine what type of interest the Watsons held in the Watson E gas well and what they intended to assign to CIG by way of the MIA. There is no question but that we may construe and determine the legal effect of a written instrument on appeal. See *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. at 133. The conveying instrument in this case is the MIA. "In case of doubt, an assignment is interpreted most strictly against the assignor, and generally the rules ordinarily applicable to the interpretation of contracts are applied." 3 Williston on Contracts § 431, p. 175 (3d ed. 1960).

## APPLICATION OF KANSAS UNIFORM COMMERCIAL CODE

We begin by determining what law controls the outcome of this action. CIG argues that this is a debtor/creditor type of litigation and that it is controlled by the Kansas Uniform Commercial Code. We disagree.

We hold that this action is not controlled by the Kansas Uniform Commercial Code. CIG attempts to create a complex debtor/creditor litigation involving priorities between competing creditors of the Watsons. CIG argues that it has a perfected security interest which has priority under Uniform Commercial

Code Article 9 over Oxy's unperfected security interest. CIG suggests that the MIA provides it with its perfected security interest. It defines Oxy as a creditor whose interests are that of an unsecured creditor under the GOA.

CIG projects this theory to argue that it has a first lien on the production payments due the Watsons before any cost of production is deducted. CIG applies the Uniform Commercial Code to reach the conclusion that the Watsons are responsible for paying one-half of the production costs.

We disagree, not only with the proposed result, but with its premise. This is not a debtor/creditor lawsuit. CIG is attempting to complicate what is a relatively simple contract interpretation case. We conclude that this action is controlled by basic assignor/assignee law.

The MIA is unambiguous and we may construe it as a matter of law. It is not and cannot be construed to be a security agreement under the Uniform Commercial Code. It does not, by its terms, create a security interest in the property of the assignor nor in the money from gas sales. See *City of Arkansas City v. Anderson*, 242 Kan. 875, 883, 752 P.2d 673 (1988); K.S.A. 1993 Supp. 84-1-201(37); K.S.A. 84-9-102(1)(a); K.S.A. 1993 Supp. 84-9-305. The MIA does not amount to an outright sale of an account as contemplated by K.S.A. 84-9-102(1)(b).

Indeed, there is nothing in the language used in the MIA which even suggests that that document was intended to be a security agreement defining rights under the Uniform Commercial Code. We believe that had the parties intended to create a security agreement under the Uniform Commercial Code, they would have done so by using the appropriate language. There is no language employed from which we can construe the MIA to be an instrument controlled by the Uniform Commercial Code.

If CIG is correct and it had a priority secured creditor position under the Uniform Commercial Code, then it somehow obtained something from the Watsons which they did not have—the right to receive production payments unburdened by production costs. Prior to 1955, the Watsons owned 100 percent of the minerals under the south half of 24-30-32. Thus, they were in a position

to dispose of the minerals or to make any transaction concerning the minerals that they desired. One of their principal desires was to turn their mineral interest into income by way of gas production. In order to do this, they entered into the GOA in which they pooled their ownership with that of Oxy. At this point, they ceded some portion of their ownership and control over the minerals which they owned. Their interest in the gas production under the GOA was reduced to 50 percent and was expanded over the entire section. They became the potential owner of a working interest in any producing well, but in order to receive one-half of production income, they agreed to pay one-half of the production expense. Oxy agreed to operate any producing gas well and, in consideration, the Watsons gave Oxy a lien on their production income. This restricted the Watsons' right to receive production income by making that income subject to a lien for production costs. The GOA lessened the interest of the Watsons in their minerals but did so in consideration and in furtherance of their desire to obtain gas production. By signing the GOA, the Watsons altered the ownership of their minerals. Their interest was thereafter burdened by and subject to the payment of 50 percent of the costs of production. In the case of *Harding v. Continental Pipe Line Co.*, 172 Kan. 724, 729-30, 243 P.2d 199 (1952), our Supreme Court dealt with the conveyance of a working interest via an oil and gas lease and said:

"The decedent-lessor had voluntarily conveyed that interest and was no longer the owner thereof. *On his death his estate acquired no greater interest in the land than he possessed. His estate was subject to the rights he had granted to others. . . .*

. . . .

". . . Defendant's right to continue to produce oil therefrom was a vested right and defendant was protected in exercising such vested right in conformity with the terms of the contract. . . . On the lessor's death his interest in the land and no more belonged to his estate. Defendant did not lose its vested rights by reason of the lessor's death. [Citation omitted.]"

We think the instant matter is somewhat analogous. In this case, the Watsons voluntarily conveyed an interest in their minerals to Oxy. They gave Oxy the right to develop a gas well on the premises and a right to subject their interests in the gas pro-

duction income to the payment of production costs. At the time they signed the MIA in favor of CIG, any interest the Watsons had in the working interest from the Watson E gas well was subject to the rights of Oxy under the GOA. CIG could acquire no greater interest in the gas production than was possessed by the Watsons. Further, as in *Harding*, Oxy had a vested right to continue to produce gas under the terms of the GOA. In essence, Oxy acquired a vested right to produce gas from the real estate in conformity with the terms of the GOA. The Watsons could not, by a unilateral assignment, extinguish the vested rights of Oxy under the GOA. The Watsons had no right under the GOA to receive income free of the lien granted to Oxy and could assign only what they possessed.

## WHAT IS THE MINERAL INCOME ASSIGNMENT?

Having determined that the MIA is not an instrument controlled by the Uniform Commercial Code, we must next determine what type of instrument it is.

This is a relatively simple determination. We have examined the MIA, and it is in form and content an assignment. The language used by the parties is that of an assignment. The parties refer to themselves on a number of occasions as assignors and assignees.

We cannot and will not create a contract for the parties which they did not intend. The MIA is obviously an assignment by the Watsons of their working interest, and other interests, in the Watson E gas well to CIG. We have no difficulty in holding that this unambiguous instrument is what the parties said it was—an assignment—and that it brings into play principles of assignor/assignee law.

There are certain uncomplicated rules employed when dealing with the rights of an assignee.

"This court has recently noted that the assignee of a contract interest acquires no greater rights from the assignment than those possessed by the assignor. See *H. Freeman & Son v. Henry's, Inc.*, 239 Kan. 161, 163, 717 P.2d 1049 (1986)." *City of Arkansas City v. Anderson*, 242 Kan. at 882.

"In an analogous situation, it is fundamental that *the assignee of a contract acquires no greater rights from the assignment than those possessed by the assignor. Aldritt v. Kansas Centennial Global Exposition*, 189 Kan. 649, 657, 371 P.2d 181 (1962); *Securities Acceptance Corporation v. Perkins*, 182 Kan. 169, 173, 318 P.2d 1058 (1957).

"In 6A C.J.S., Assignments § 99, we find the following:

'Generally, the assignee of a chose takes it subject to all equities and defenses existing between the assignor and the debtor prior to the notice of assignment, but not those arising after notice of the assignment.'

Likewise, in 6 Am. Jur. 2d, Assignments § 102, we find this statement:

'In an action on a claim assigned, the assignee is ordinarily subject to any setoff or counterclaim available to the obligor against the assignor and to all other defenses and equities which could have been asserted against the chose in the hands of the assignor at the time of the assignment.' " *H. Freeman & Son v. Henry's, Inc.*, 239 Kan. 161, 163, 717 P.2d 1049 (1986).

" *[I]t is axiomatic that an assignee of a promissory note stands in the shoes of the assignor and obtains the rights, title, and interest that the assignor had at the time of the assignment.* [Citations omitted.] Moreover, the assignee of a debt ordinarily obtains all remedies which were available to the assignor against the debtor for the enforcement of the obligation.' " (Emphasis added.) *Cadle Company II, Inc. v. Lewis*, 254 Kan. 158, 164, 864 P.2d 718 (1993) (quoting from *Thweatt v. Jackson*, 838 S.W.2d 725 [Tex. App. 1992]).

The law is settled that CIG could not acquire a greater right from the assignment than those possessed by its assignor. In this case, the assignor's right to receive production income was subject to a lien in favor of their share of the cost of production. The assignee can gain no greater interest. This is a fundamental rule of law, and no resort to the complexities of the Uniform Commercial Code can render it impotent in this action. It is conceivable that at one time the Watsons may have expected to receive their share of production income along with a bill of their share of production costs. However, the production costs are now in default in excess of $14,000; Oxy has a lien on the production income for the payment of those costs, and it is a lien which CIG as the assignee of the Watsons cannot avoid. Any argument to the contrary ignores the realities with which we must deal.

The assignee "stands in the shoes of the assignor." This is a time-honored rule of law, and it means that the obligations, de-

fenses, etc., which burden the assignor will equally burden the assignee. The production income of the Watsons is burdened with a lien. CIG cannot "stand in the shoes" of its assignor and avoid that lien.

## WHAT DID THE WATSONS ASSIGN?

What did the MIA assign? The Watsons specifically assigned to CIG, among other things, their "working interest payments" in the Watson E gas well. This opinion primarily deals with the assignment of the "working interest payments," which will be the focus of this portion of the opinion. We think it significant that the parties, in drafting the MIA, specifically used the term "working interest." While that term may not be totally descriptive to the general public, it is a term frequently used and clearly understood in the oil and gas industry. CIG is a sophisticated entity in the oil and gas industry, and we have no doubt but that it was conversant with the term "working interest" and knew precisely what it would obtain by using that term in an assignment.

The term "working interest" is virtually synonymous with the term "leasehold interest." 1 Pierce, Kansas Oil and Gas Handbook § 4.09 p. 4-8 (rev. ed. 1991); Williams and Meyers, Manual of Oil and Gas Terms, pp. 646, 1379 (8th ed. 1991). " *'The working interest owner bears the expense of exploration, drilling, and producing oil or gas.'* " (Emphasis added.) *Mulsow v. Gerber Energy Corp.*, 237 Kan. 58, 61, 697 P.2d 1269 (1985). See *Lathrop v. Eyestone*, 170 Kan. 419, 424, 227 P.2d 136 (1951); *Davis v. Hurst*, 150 Kan. 130, 90 P.2d 1100 (1939); *Robinson v. Jones*, 119 Kan. 609, 240 Pac. 957 (1925). These authorities make it clear that the term "working interest" refers to the usual interest of a lessee in an oil and gas lease and is generally composed of seven-eighths of the production. It is contrasted with the landowner's royalty interest, which bears no part of the production expense.

It is important to note that CIG took the assignment of a full working interest under the MIA. There are no qualifying words used to indicate that the assignment of the "working interest" in the Watson E gas well was intended to assign anything more or less than that term implies. The working interest owners bear the

costs of producing oil and gas from the well head. The use of the term "working interest" to assign an interest free and clear of the burden of paying production expenses is an oxymoron. We doubt that the term "working interest" would be used in the industry to identify an interest free of the costs of production. There are interests in a producing oil and gas well which are free of costs, and these are the royalty interests. Hence, the landowner generally owns a one-eighth royalty interest, which is not subject to payment of the costs of production. Investors in the well who receive an interest free of costs of production receive overriding royalty interests. The use of any of those terms in the MIA might very well have assigned an interest in production free of costs. It is difficult, however, for us to believe that CIG would expect, in good faith, to receive an assignment of a working interest in a producing gas well that was free of the burden of paying part of the costs of production. A working interest by definition bears all or part of the costs of production. The assignment of a working interest to a third party cannot be made free and clear of that obligation without language expressly indicating that that is the intent of the parties.

CIG suggests that it was assigned production payments, which it argues are non-cost bearing. We cannot agree. The MIA specifically assigns to CIG the "working interest" of the Watsons in this gas well. As we have pointed out, the term "working interest" is a term of art, and we will not assign to it a meaning other than that used in our decisions and commonly understood in the industry.

Our construction of the GOA leads us to conclude that the working interest of the Watsons in this particular gas well gave them the right to receive one-half of the production payments and the obligation to pay one-half of the production expenses. We hold that by the assignment, CIG received the working interests of the Watsons in the Watson E gas well. By virtue of that assignment, CIG has the right to receive one-half of the production payments from the Watson E gas well subject to the lien in favor of Oxy for the payment of one-half of the costs of production. Since CIG "stands in the shoes" of the Watsons, it can

acquire no greater interest in the production payments than was possessed by its assignor. Its assignor could not demand one-half of the production payments free of the lien of Oxy for one-half of the production expenses and neither can its assignee, CIG.

The adoption of the theory advanced by CIG would, in our opinion, have a disastrous result on the oil and gas industry. Someone must take the risk and burden of drilling wells and paying the costs of production. This is commonly accomplished by selling "working interests" in the proposed wells. By the sale of these working interests, capital is raised to drill and operate wells for the production of oil and gas. If such an owner could assign his working interest free of the burden of paying the costs of production, the result would be chaos. Developers and operators would find their working interest partners replaced by "production owners," who would take the income and run. Unfortunately, an operator cannot operate very long if the income from production is being drained by "production interest owners" who will not share in the costs of that production. That is not a permissible result. The law requires an assignee to "stand in the shoes" of its assignor, and it is this simple tenet of law that dictates our conclusion in this action.

We do not mean to imply by our decision that CIG has any affirmative obligation to pay for the costs of production over and above the production income it receives. As we construe the MIA, CIG is not responsible for operating costs that exceed production income. The working interest share, which was assigned by the Watsons, is subject first of all to the payment of one-half of production costs. Any inference in the trial court's decision that CIG would be responsible for operating costs which exceed its assigned share of the production income is set aside.

We also note that at some time in the history of the Watson E gas well, the Watsons may have been entitled to receive their share of production income and then pay their share of production expenses. That time has long since passed. At this point in the litigation, Oxy is owed over $14,000 in production costs, and it has a lien over all of the production payments until those costs are received. For all practical purposes, the right to receive pro-

duction payments without first deducting one-half of the share of production costs is past history.

On remand, the trial court must determine the precise amount of production costs owed to Oxy by CIG. If CIG has received production income on which costs are owed, an appropriate judgment should be rendered in favor of Oxy and against CIG. If the monies have been escrowed or are still held by Oxy, Oxy should pay them over to CIG less CIG's share of the accrued production costs.

There is one final bit of accounting. The Watsons assigned to CIG their royalty interest as well as their working interest in the Watson E gas well. Since the royalty interest is not a cost-bearing interest, it cannot be subjected to the payment of production expenses. The trial court is directed to determine what portion of the payments assigned by the Watsons to CIG are royalty payments. Those royalty payments should be paid directly to CIG without deduction for any share of production costs.

The decision of the trial court is affirmed, and the matter is remanded on the basis set forth above.

Affirmed and remanded.