KANSAS CITY ROYALTY COMPANY, L.L.C., Robert E. Thomas Revocable Trust, and D.D.H., L.L.C., Plaintiffs,

v.

THOROUGHBRED ASSOCIATES, L.L.C., Defendant.

Civ.A. No. 02–2311–KHV.

United States District Court, D. Kansas.

May 9, 2003.

Brennan P. Fagan, William J. Skepnek, Skepnek Law Firm, PA, Lawrence KS, David E. Pepper, Michael J. Novotny, Hartzog, Conger, Cason & Neville, Oklahoma City, OK, for plaintiffs.

John G. Pike, Steven D. Gough, Withers, Gough, Pike & Peterson LLC, Wichita, KS, for defendant.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Plaintiffs filed suit against Thoroughbred Associates, L.L.C. to confirm their royalty

and working interest in certain oil and gas wells in Commanche County, Kansas. Plaintiffs assert claims for breach of contract, breach of the duty to deal in good faith with competing oil and gas interest owners, and unjust enrichment. This matter comes before the Court on *Defendant's Motion To Dismiss Under Fed.R.Civ.P. 19(b)* (Doc. # 20) filed November 27, 2003. Defendant seeks to dismiss the case pursuant to Rule 12(b)(7), Fed.R.Civ.P., for failure to join indispensable parties under Rule 19(b), Fed. R.Civ.P. In particular, defendant asserts that plaintiffs did not join the owners of mineral leases related to oil and gas wells in which plaintiffs seek an interest, and that joinder of three of these lease owners would destroy diversity jurisdiction. For reasons stated below, the Court sustains defendant's motion.

### Legal Standards

Under Rule 12(b)(7), Fed.R.Civ.P., the Court may dismiss a case for failure to join a necessary and indispensable party under Rule 19. The Court exercises discretion in deciding a Rule 12(b)(7) motion. *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier,* 17 F.3d 1292, 1292 (10th Cir.1994) (citing *Navajo Tribe of Indians v. New Mexico,* 809 F.2d 1455, 1471 (10th Cir.1987)). Defendant bears the burden to produce evidence which shows the nature of the interest possessed by an absent party and that such party's absence will impair the protection of that interest. *See Citizen Band,* 17 F.3d at 1292. Defendant can satisfy this burden with affidavits of persons having knowledge of the interest as well as other relevant extra-pleading evidence. *See id.*

In deciding whether a party is indispensable under Rule 19(b), the Court applies a two-part analysis. *See Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.,* 94 F.3d 1407, 1411 (10th Cir.1996). First, it determines under Rule 19(a) whether the party is necessary and must be joined if feasible. *Id.* A party is necessary if

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 19(a), Fed.R.Civ.P. If the party is necessary but cannot be joined, the Court determines under Rule 19(b) whether the party is indispensable. *Rishell,* 94 F.3d at 1411. In order to conclude that a party is indispensable, the Court must find "in equity and good conscience" that the action should not proceed in the party's absence. Rule 19(b), Fed.R.Civ.P.; *Sac & Fox Nation of Mo. v. Norton,* 240 F.3d 1250, 1259 (10th Cir.2001). In making this determination, the Court balances the following factors:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b), Fed.R.Civ.P. The Court exercises discretion in determining the weight of each factor. *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.,* 104 F.3d 1205, 1211 (10th Cir.1997).

### Factual Background

For purposes of diversity of citizenship, plaintiffs in this case—Kansas City Royalty Company, L.L.C., the Robert E. Thomas Trust and DDH, L.L.C. (the "Kansas City Royalty entities")—are residents of Oklahoma. *Amended Complaint* (Doc. # 10) filed July 24, 2002 ¶¶ 1–3. Effective January 1, 1999, the Kansas City Royalty entities purchased from OXY U.S.A., Inc. ("OXY") a portion of the mineral rights in a parcel of land in Comanche County, Kansas. *Id.* ¶ 8. The Kansas City Royalty entities now own an undivided one-third interest in all of the oil and gas and other minerals underlying

that land. *Id.* ¶ 7. The remaining two-thirds mineral interest in the land is owned by other individuals. OXY no longer has any mineral interest in the property.

Plaintiffs' one-third mineral interest is subject to a lease which OXY executed before plaintiffs purchased their interest. On July 21, 1998, OXY granted Thoroughbred Associates, L.L.C. ("Thoroughbred") an oil and gas lease "from surface, down to and including, but not below, the base of the deepest producing interval established in a well drilled during the primary term" under the parcel of land (the "OXY lease"). *Id.* ¶ 9; Exhibit A to OXY lease. Under the lease, Thoroughbred had a "working interest" of 13/16 of the market value of oil and gas produced on the parcel of land.[1] Because the

lease relates to only a one-third mineral interest, Thoroughbred actually had a working interest of 13/48 (or 13/16 times 1/3). OXY retained a "royalty interest" of 3/16 of the market value of oil and gas produced on the parcel of land. Again, because the lease relates to only a one-third mineral interest, OXY actually had a royalty interest of 3/48 (or 3/16 times 1/3), which it sold to plaintiffs on January 1, 1999.[2]

The OXY lease is for a definite primary term of one year and as long thereafter as oil or gas is produced from the parcel of land or lands pooled or unitized with the parcel of land. *Amended Complaint* (Doc. # 10) ¶ 10. Paragraph 4 of the lease authorizes Thoroughbred to pool or unitize the land, as follows:[3]

---

**1.** A working interest is the operating interest under an oil and gas lease. *Reynolds–Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 846, 1 P.3d 909, 914 (2000). The owner of a working interest has the exclusive right to export the minerals on the land, but the working interest owner bears the cost of exploration, development and operation of the property. *See Mulsow v. Gerber Energy Corp.*, 237 Kan. 58, 61, 697 P.2d 1269, 1272 (1985). In contrast, an owner of a royalty interest bears no part of the production expense. *See OXY USA, Inc. v. Colo. Interstate Gas Co.*, 20 Kan.App.2d 69, 80, 883 P.2d 1216, 1224 (1994).

**2.** The record does not disclose the royalty interest owners in the remaining two-thirds mineral interest. Eighteen entities and individuals collectively own the entire working interest on the remaining two-thirds mineral interest. These entities and individuals include W.G. Alpaugh; Austin & Austin, Inc.; Austin, L.P.; Kevin C. Davis; J.R. McGinley, Jr.; Lippizzan Petroleum Corporation; Lippizzan Petroleum 1997 LLC; Parker Petroleum, Inc.; Pickrell Acquisitions, Inc.; Debbie Schmitt, Inc.; The Cal and Jo Ann Setzer Trust; William M. Spencer III; Charles E. Brown IV Trust; Kent A. Deutsch; P.A. McGinley Company, LLC; James B. Phillips; Charles E. Stevens, Jr. Trust # 1; and John R. Norton, III. In addition to their working interest in the remaining two-thirds mineral interest, these 18 entities and individuals also purchased from Thoroughbred or its assigns the working interest granted to Thoroughbred under the OXY lease.

**3.** While frequently used interchangeably, the terms "pooling" and "unitization" refer to separate procedures. Pooling involves the combination of several small tracts of land to meet the spacing requirements for a single well. Unitization refers to field-wide or partial field-wide operation of a producing reservoir which involves

multiple adjoining land tracts. *See Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411 n. 3 (10th Cir.1990). The Tenth Circuit described unitization as follows:

> Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply. Unitization resulted from state legislatures' efforts to modify the rule of capture which had previously been applied to oil and gas law. The goals of unitization are conserving resources by preventing waste and protecting landowners' correlative rights. Following unitization of an oil field, the royalty clause of a oil and gas lease generally is modified and the lessor becomes entitled to a royalty based on a pro rata share of the production attributable to its land, regardless of whether production is from that land or another tract included within the unit. The working interest owners' share is based on a participation formula calculated from geological, physical and economic data. No single method of calculating the participation formula is appropriate for all situations and although the most frequently employed basis for allocating unitized production is surface acreage arriving at a perfect participation agreement is impossible. . As this court has explained:

>> The percentage of an estimated pool recovery under a unitized operation assigned to a particular lease represents at best only an estimated contribution from that tract under a single unitized operation. Without more, it cannot be taken as evidence of the estimated recovery therefrom under an independent, individual operation of the lease.

> *Stanolind Oil & Gas Co. v. Sellers*, 174 F.2d 948, 956 (10th Cir.), *cert. denied*, 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531 (1949).

> Two methods exist whereby separately-owned tracts can be combined in a single unit:

Lessee is granted the right and power to pool or unitize all, or part of the lands covered hereby with adjoining or contiguous lands in order to form a unit, or units, for the production of oil and/or gas *when said units are necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowables are established by State, Federal or other regulatory bodies.* All lands so pooled into a unit, or units, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if said lands were included in the lease. If production is found on the pooled lands, it shall be treated as if production is had from this lease, whether the well, or wells be located on the lands covered by this lease or not. Any well drilled on any such units shall be considered as a well hereunder. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit, only such portion of the royalties stipulated herein as a portion of the above-described lands placed in said unit bears, on an acreage basis, to the total lands so pooled or unitized in the particular unit involved. In the event any of the lands covered hereby are so pooled or unitized, Lessee shall furnish Lessor a certified copy of the pooling instrument filed of record, together with the recording data

thereof, on or before the expiration date of this lease.

OXY lease at 2, Exhibit A to *Amended Complaint* (Doc. # 10) (emphasis added). A "regular spacing pattern" generally refers to allocating a certain number of acres per well. An "allowable" generally refers to a maximum volume of oil or gas which can be produced from a single well on a daily basis.[4] Under the lease, Thoroughbred agrees to drill all wells necessary to prevent drainage from offsets on adjoining lands. *Id.* ¶ 5.[5] In addition, as to each well which Thoroughbred drills on the parcel of land, it must notify the lessor (currently the Kansas City Royalty entities) of certain technical information pertaining to that well. *Id.*

On September 14, 1998, Thoroughbred executed and filed a declaration of unitization of oil and gas leases ("Unit Declaration"). The Unit Declaration pooled and unitized the OXY lease with the mineral leases of several adjacent parcels of land which contained similar pooling and unitization provisions. Exhibit B to *Amended Complaint* (Doc. # 10). The unitized gas leasehold estate is referred to as the Rietzke Unit which consists of approximately 640 acres. The land subject to the OXY lease consists of approximately 120 acres, and Thoroughbred included all of it in the Unit Declaration. From one of its wells in the Rietzke Unit, Thoroughbred has produced natural gas from the Altamont sub-

---

voluntary unitization by contract or forced unitization by regulatory authority. * * *

The unitization clause of an oil and gas lease grants the lessee the power to unitize the lessors [sic] interest without further consent by the lessor. Without such a clause, the lessee has no authority to pool or unitize the interests of the lessor. Because neither the lessor nor the lessee usually know the relevant facts concerning the need for unitization at the time the lease is signed, unitization clauses must be framed in general terms.

*Amoco,* 904 F.2d at 1410–11.

4. In an effort to prevent waste and to protect the rights of neighboring mineral interest owners, state regulatory agencies often establish spacing patterns and allowables to address potential dilemmas faced by owners of mineral interests in small or irregular shaped tracts of land. *See Superior Oil Co. v. R.R. Comm'n. of Tex.,* 519 S.W.2d 479, 481–82 (Tex.App.1975). For example, if one well draws oil or gas from a 100 acre area, four owners of land tracts of only 25 acres

may be unable to drill wells and make a profit unless they can drain oil or gas from their neighbors. To address this problem, states may establish a spacing pattern of 100 acres per well, thus encouraging lease owners to pool or unitize their leases and drill a single well for the entire 100 acre area. State regulatory agencies also can establish an "allowable." In the above example, an allowable could be established which would limit each well to 25 per cent of its maximum capacity to help prevent drainage of oil and gas from neighboring land tracts.

5. Because of the potential for some migration of oil and gas which can be withdrawn from the leased premises by wells on adjoining lands, a lessee generally has a duty to protect the premises from substantial drainage including drilling offset wells near the lease boundary. *Rush v. King Oil Co.,* 220 Kan. 616, 618–19, 556 P.2d 431, 435 (1976). In the OXY lease, Thoroughbred must drill all wells necessary to prevent drainage from offset wells on neighboring property.

surface geological reservoir (the "Altamont formation").[6]

At some point in time, Thoroughbred assigned 100 per cent of its working interest to other individuals and entities.[7] At this time, it does not own any interest in the OXY lease, or in any oil and/or gas lease in the Rietzke Unit, but it continues to operate the Rietzke Unit on behalf of the lease owners, *i.e.* it develops and produces oil and gas for the owners. Eighteen individuals or entities own the leases which comprise the Rietzke Unit, but plaintiffs have not sued any of them. Three of the lease owners, who respectively own working interests of 10 per cent, 10 per cent and 9.625 per cent in the Rietzke Unit, are residents of Oklahoma.[8] They have not granted Thoroughbred the authority to settle or compromise their leasehold interests in this action, to represent them in this action, or to convey or dilute or diminish any of their respective interests in the unit or the leases of which it is comprised.[9]

In late 2001, Thoroughbred drilled a test well on the Rietzke Unit into the Viola sub-surface geological reservoir (the "Viola formation").[10] Thoroughbred maintained that under the OXY lease, plaintiffs' mineral rights in the Viola formation were no longer included in the Rietzke Unit—apparently because Thoroughbred did not drill a well into the Viola formation during the primary term of the lease. Thoroughbred also maintained that upon further examination of its lease from OXY, unitization of the OXY lease was not permitted as to any geological formation or layer and that in 1998, Thoroughbred had mistakenly included the OXY lease in the Rietzke Unit.[11] Even though Thoroughbred maintained that the OXY lease should not have been included in the Rietzke Unit, it asked plaintiffs to waive any objection to inclusion in the Rietzke Unit and agree to amend the Unit Declaration so that the unit would be limited to the Altamont geological formation and would not be in force as to any geological formation below the Altamont formation—including the Viola and Upper Mississippi layers. *See* Exhibits 3 and 23 to *Plaintiffs' Objection* (Doc. # 25). Plaintiffs

---

**6.** A lease and/or a unit often is effective only as to certain geological formations. As explained above, the OXY lease is limited "from surface, down to and including, but not below, the base of the deepest producing interval [formation] established in a well drilled during the primary term." Exhibit A to OXY lease, attached to *Amended Complaint* (Doc. # 10). The lease also provides that if a well is drilled anywhere in the unit, the well shall be considered as a well drilled on the leased land. OXY lease at 2. Accordingly, as to the OXY lease, the Rietzke Unit appears to be limited to the base of the deepest producing geological formation established in a well during the first year.

**7.** The record does not disclose when Thoroughbred assigned its interest in the OXY lease. As of March 28, 2002, however, it still owned a portion of the working interest in that lease. *See* Exhibit 25 at 1, attached to *Plaintiffs' Objection To Defendant's Motion To Dismiss Under Fed.R.Civ.P. 19(b) And Brief In Support* (Doc. # 25) filed January 10, 2003.

**8.** The three Oklahoma lease owners are J.R. McGinley, Jr., P.A. McGinley Company, LLC and the Charles E. Brown IV Trust. As explained above, plaintiffs are also residents of Oklahoma. Accordingly, the Court cannot join the Oklahoma lease owners without destroying diversity jurisdiction.

**9.** Thoroughbred and nine of the 18 lease owners have executed a joint operating agreement ("JOA"). *See* Exhibit 4 to *Plaintiffs' Objection* (Doc. # 25). Under the JOA, for a number of purposes, Thoroughbred is the designated agent for absent working interest owners in the Rietzke Unit. *See id.*, Art. IV (title examination), Art. V (drilling and development), Art. X (Thoroughbred may settle uninsured claims up to $4,000). None of the Oklahoma lease owners have signed the JOA.

**10.** Thoroughbred also apparently drilled a test well into the Upper Mississippi geological formation. The Viola and Upper Mississippi formations are below the Altamont formation.

**11.** As noted, Paragraph 4 in part provides that the OXY lease could be included in a gas unit "when said units are necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowables are established by State, Federal or other regulatory bodies." OXY lease at 2, Exhibit A to *Amended Complaint* (Doc. # 10). Thoroughbred claims that paragraph 4 of the OXY lease was not satisfied, but it does not explain how this condition was not fulfilled. The Court assumes that Thoroughbred maintains that the Rietzke Unit was not necessary to conform with state regulations, but Thoroughbred has not specified the regulations in force when it attempted to form the Rietzke Unit.

did not agree to Thoroughbred's proposal and filed this suit on July 1, 2002.

The Kansas City Royalty entities allege that Thoroughbred breached the OXY lease and Unit Declaration by refusing to pay or account to plaintiffs for their contractual share of revenue from production from all wells in the Rietzke Unit, including those wells below the Altamont formation (Count I); that Thoroughbred breached the lease by refusing to drill an additional well in the Rietzke Unit to offset a well outside the unit which was draining oil and gas from under the land subject to the OXY lease (Count II); that Thoroughbred breached its duty to deal in good faith with a competing oil and gas interest owner (Count III); that Thoroughbred breached its duty to provide timely well information to plaintiffs (Count IV); and that Thoroughbred wrongfully denied plaintiffs the opportunity to participate as a working interest owner in the Rietzke Unit, as to the Viola and Upper Mississippi formations (Counts V and VI). Plaintiffs seek (1) to establish and confirm a royalty or working interest in each well in the Rietzke Unit;[12] (2) an accounting of all oil and gas produced from the Rietzke Unit, including payment on an apportioned basis; (3) to confirm an unleased mineral interest as to the Viola and Upper Mississippi formations under the land subject to the OXY lease and the land comprising the Rietzke Unit; (4) to preclude Thoroughbred from amending the Rietzke Unit to exclude the OXY lease; and (5) a constructive trust and equitable lien on the leases and equipment in the Rietzke Unit and the revenue produced from the leases.

In late 2002, Thoroughbred and the 18 owners of the leases in the Rietzke Unit filed suit against the Kansas City Royalty entities in the District Court of Comanche County, Kansas. In that suit, they seek (1) a declaration that the Rietzke Unit declaration should be reformed to exclude the OXY lease and (2) repayment of all royalties paid to the

Kansas City Royalty entities on the Rietzke Unit.[13] In the Comanche County suit, the Kansas City Royalty entities have answered and filed a counterclaim without challenging the jurisdiction of the state court. The state court counterclaim mirrors plaintiffs' complaint in this court.

Thoroughbred seeks to dismiss this action because plaintiffs have not joined Rietzke Unit lease owners who are indispensable parties and because joinder of three of these lease owners would destroy diversity jurisdiction.

### *Analysis*

■ As discussed above, before the Court can determine whether the absentee lease owners are indispensable parties under Rule 19(b), it must first find that they are necessary parties under Rule 19(a). A party is necessary if

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 19(a), Fed.R.Civ.P.

Thoroughbred does not specify under which prong the lease owners in the Rietzke Unit should be considered necessary parties. Its arguments, however, seem to fall into two categories: (1) without the lease owners, complete relief cannot be accorded among the parties; and (2) absent lease owners have an interest related to the subject of this action and are so situated that disposition of

---

12. Plaintiffs apparently claim that as to the Altamont formation, they have a royalty interest under the OXY lease, and that as to formations below the Altamont layer, they have both a royalty interest and working interest and are entitled to participate in the Rietzke Unit.

13. As to a well the Kansas City Royalty entities drilled on the land subject to the OXY lease, the 18 lease owners also seek to (1) confirm their working interest in two thirds of the oil, gas and other minerals produced from the land subject to the OXY lease and (2) assume operation of the well based on their two-thirds working interest.

this action in their absence would impair or impede their ability to protect that interest.

■ Plaintiffs point to a number of issues in this case which must be decided solely as to them and Thoroughbred, but they do not explain how this Court could grant their requested relief without joining the lease owners as parties.[14] Except for the request to enjoin defendant from amending the Unit Declaration, the Court cannot envision how it could award plaintiffs the requested relief without taking a portion of an interest of a non-party in a lease, equipment or revenue from a lease. Indeed, plaintiffs concede that if they prevail, the interests of the 18 absentee lease owners will be diluted. *See Plaintiffs' Objection* (Doc. # 25) at 7. Because the Court cannot grant complete relief without impairing the working interests of the 18 lease owners of the Rietzke Unit, the lease owners are necessary parties under Rule 19(a)(1) and 19(a)(2)(i).[15] *See Cross Timbers Oil Co. v. Rosel Energy, Inc.*, 167 F.R.D. 457, 460 (D.Kan.1996) (because issues involved rights of future gas production, joint venturers to future royalties were necessary parties).

Because the absentee lease owners are necessary parties, the Court next addresses whether they are indispensable parties under Rule 19(b). *See Rishell*, 94 F.3d at 1411. To conclude that a party is indispensable, the Court must find "in equity and good conscience" that the action should not proceed in the party's absence. Rule 19(b), Fed.R.Civ. P.; *see Sac & Fox Nation*, 240 F.3d at 1259. In making this determination, the Court balances the following factors:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b), Fed.R.Civ.P.

## I. Extent Of Potential Prejudice

■ Plaintiffs argue that Thoroughbred represents not only its own interests, but the proportionate interests of the 18 absent lease owners.[16] Thoroughbred denies that it represents the lease owners, and it has presented affidavits from three Oklahoma lease owners which state that they have not authorized defendant to represent them in this suit or otherwise compromise their interests in the Rietzke Unit.[17] Thoroughbred notes that if

---

**14.** As noted, plaintiffs seek (1) to establish and confirm a working interest in each well in the Rietzke Unit; (2) an accounting of all oil or gas produced from the Rietzke Unit including payment to plaintiffs of their share on an apportioned basis; (3) to confirm an unleased mineral interest as to the Viola and Upper Mississippi formations under the land subject to the OXY lease and the land comprising the Rietzke Unit; (4) to preclude defendant from amending the Rietzke Unit to exclude the OXY lease; and (5) a constructive trust and equitable lien on the leases and equipment in the Rietzke Unit and the revenue produced from the leases.

**15.** Plaintiffs insist that this action only involves Thoroughbred's conduct as operator of the Rietzke Unit, its interpretation of the unit declaration and OXY lease, and its refusal to allow plaintiffs to participate in the Rietzke Unit. Plaintiffs ignore the effect of their requested relief—which by their own admission would dilute the working interests of the lease owners in the Rietzke Unit.

**16.** Plaintiffs apparently argue that because any losses to the leasehold owners will be borne proportionately, the leasehold owners do not have an interest in the subject matter of this suit. The fact that lease owners will be prejudiced proportionately does not mean that they will not be prejudiced.

**17.** Plaintiffs note that for a number of purposes under the JOA, Thoroughbred is the designated agent for absent working interest owners in the Rietzke Unit. *See, e.g.*, Art. IV (title examination), Art. V (drilling and development), Art. X (Thoroughbred may settle uninsured claims up to $4,000). Plaintiffs, however, do not deny that the Oklahoma lease owners have not signed the JOA. Also, plaintiffs do not point to any provision in the JOA which gives Thoroughbred the authority to represent the lease owners in litigation involving claims which would impair their working interests. The fact that Thoroughbred has represented the 18 lease owners in other matters does not compel the conclusion that it has authority to do so in this case. Indeed, the Oklahoma lease owners have stated that Thoroughbred does not have such authority.

plaintiffs prevail on their claim for a working interest in the Rietzke Unit, it will lose nothing because it has no ownership interest in unit production. In contrast, if plaintiffs prevail, lease owners in the Rietzke Unit will lose a portion of their working interests and corresponding revenue. As to plaintiffs' claims, Thoroughbred may have overlapping interests with the lease owners,[18] but that limited overlap does not show that Thoroughbred would defend the interests of lease owners as if it owned all of the leases. *See Cross Timbers*, 167 F.R.D. at 460 (when multiple parties claim ownership interests in same property, and particularly where oil leases are involved, all potential claimants must be joined to provide complete relief and protect interests of absent parties).

## II. Protective Measures To Lessen Or Avoid Prejudice

■ Plaintiffs suggest that the Court could reduce potential prejudice by requiring joinder of the 15 lease owners who do not live in Oklahoma and shape any relief by excluding the Oklahoma lease owners. Plaintiffs' proposal has superficial appeal, but the Oklahoma lease owners own approximately 30 per cent of the working interest in the Rietzke Unit. Plaintiffs do not suggest how the Court could structure a judgment to prevent 15 lease owners who live outside Oklahoma from bearing a disproportionate loss which should also be allocated to Oklahoma lease owners. Because the Court can exercise supplemental jurisdiction over claims of necessary parties who are joined as *defendants*, in an exception to the complete diversity rule, plaintiffs also suggest that the Court should require Thoroughbred to implead the Oklahoma lease owners on a claim for indemnity and contribution. *See* James Wm. Moore et al.,

*Moore's Federal Practice:3d* § 19.04[1][b]. Such a procedure might be appropriate in extraordinary circumstances (such as where plaintiff had no alternative remedy against a non-diverse party), but the procedure should not be routinely employed as an end run around Rule 19. In addition, plaintiffs do not specify how such a procedure could be employed in this case. Thoroughbred does not have a working interest in the Rietzke Unit, and the Court could not order Thoroughbred to give plaintiffs a working interest in the Rietzke Unit with the understanding that Thoroughbred could recover that interest from Oklahoma lease owners. In sum, plaintiffs' novel suggestions do not sufficiently protect the 18 lease owners.

## III. Adequacy Of A Judgment In This Action

■ Plaintiffs argue that if they are successful in this action, they will not need to sue the absentee lease owners because the JOA and/or gas division orders[19] require a balancing of accounts between the working interest owners of the Rietzke Unit. The Court disagrees. Only nine of the absent lease owners have signed the JOA and none of the three lease owners from Oklahoma have signed it. Plaintiffs have submitted one gas division order for a lease in the Rietzke Unit. Although it provides that the owners will indemnify Thoroughbred for any loss based on their proportional interest, Exhibit 6 at 3 to *Plaintiffs' Objection* (Doc. # 25), the order does not provide Thoroughbred authority to litigate or assign a percentage of the lease owner's working interest. Plaintiff apparently assumes that a judgment here will bind the 18 absent lease owners. Given that no lease owner is currently a party to

---

18. For example, defendant and the lease owners likely have similar interests in avoiding an accounting of all past revenues from the Rietzke Unit, as plaintiffs demand in this suit.

19. A gas division order sets out the specific percentage interest of each owner in a lease and requires the operator to pay the owners of the royalty and working interests according to the division of interest stated in the order. The gas division order for the "Jaimie Lease" which is included in the Rietzke Unit states:

> In case of adverse claim of title to the land from which such natural gas is produced or adverse claim of title to the natural gas sold and purchased under this Division Order, each of the undersigned authorize Thoroughbred to withhold payment without obligation to pay any interest on the amount so withheld until satisfactory indemnity shall be furnished to Thoroughbred against such adverse claim or claims or until title shall be made satisfactory to said Thoroughbred.

Jaimie Gas Division Order at 3, Exhibit 6 to *Plaintiffs' Objection* (Doc. # 25).

this action, however, the Court has substantial doubt that a Kansas state court would find that this Court's judgment binds absentee lease owners.

## IV. Whether Plaintiff Will Have An Adequate Remedy

Plaintiffs have an adequate remedy if this action is dismissed. In the state court action by defendant and the 18 lease owners, plaintiff has appeared without contesting jurisdiction and asserted counterclaims which are substantially identical to the claims asserted in this action. Plaintiffs correctly note that the availability of an adequate remedy is not sufficient by itself to dismiss a case under Rule 19. *See Cross Timbers*, 167 F.R.D. at 461. When this factor is combined with the other factors discussed above, however, dismissal is appropriate.

Plaintiffs argue that because 15 of the lease owners could intervene without destroying diversity and they have not done so, such inaction announces that as a practical matter they view joinder as unnecessary. The decision not to intervene, however, is not dispositive under Rule 19. The Tenth Circuit has noted:

> To argue ... that the United States can protect its interest through voluntary intervention would render Rule 19(b) almost completely nugatory. A party satisfying Rule 19(a)(2)(i), and yet not joined, thus requiring a Rule 19(b) analysis, would always satisfy the prerequisites for intervention as of right under Fed.R.Civ.P. 24(a), which, in part, allows intervention when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
>
> ... [A] Court could never find a Rule 19(a)(2)(i) party indispensable under Rule 19(b), because such a party could always protect his interest by intervening. The purpose of Rule 19, however, is not to exhort an interested person to exercise its

Rule 24 rights. We decline to adopt an interpretation of Rules 19(a)(2)(i) and 19(b) that completely emasculates them of any meaning.

*Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1472 n. 25 (10th Cir.1987).

**IT IS THEREFORE ORDERED** that *Defendant's Motion To Dismiss Under Fed. R.Civ.P. 19(b)* (Doc. # 20) filed November 27, 2003 be and hereby is **SUSTAINED**.