**WICHITA INVESTORS,
L.L.C., Plaintiff,**

v.

**WICHITA SHOPPING CENTER
ASSOCIATES, L.P., et al.,
Defendants.**

No. CIV.A. 02–2186–CM.

United States District Court,
D. Kansas.

June 5, 2003.

Kenneth C. Jones, Thomas E. Ruzicka, Norton, Hubbard, Ruzicka & Kreamer, LC, Olathe, KS, for Plaintiff.

James A. Walker, Sean C. Brennan, Triplett, Woolf & Garretson, LLC, Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Wichita Investors, L.L.C. filed this contract action against defendants Wichita Shopping Center Associates, L.P. and WSCA Wichita Management Corporation (referred to herein collectively as "WSCA"). Plaintiff claims that it is entitled to the payment of back rents and that defendants are obligated to construct a screening wall on certain leased property. Both plaintiff and defendants have moved for summary judgment. This matter is before the court on plaintiff's Motion for Summary Judgment (Doc. 24) and defendants' Motion for Summary Judgment (Doc. 26).

## I. Facts [1]

On March 1, 1968, September 30, 1968, and May 13, 1971, Clear Lake, Inc. (Clear Lake) leased land that is the subject of the present litigation (the Marina Lakes Shopping Center) to an individual named Harry Bledsoe. Clear Lake and Bledsoe subsequently entered into supplemental lease agreements, which served to separate the land originally leased to Bledsoe pursuant to those original leases. Under the terms of the three original leases (Original Leases), Bledsoe was obligated to pay Clear Lake a base rent that would be periodically adjusted pursuant to the Consumer Price Index (CPI).

On July 19, 1972, Bledsoe assigned to the Hanson Development Company (Hanson) portions of the property he held pursuant to those leases. That same day, Clear Lake and Hanson entered into a lease (the Controlling Lease), which cov-

---

1. Unless otherwise indicated, the following facts are not in dispute.

ered all the lands leased by Clear Lake to Hanson, including those lands which Bledsoe had just assigned to Hanson. Plaintiff is the successor in interest to Clear Lake pursuant to a contract for sale dated September 9, 1999 and subsequent assignment to plaintiff. Defendant Wichita Shopping Center Associates, L.P., is the successor in interest to Hanson. Plaintiff is the current lessor, and defendants are the current lessees, of the Marina Lakes Shopping Center.

Plaintiff alleges multiple breaches of the Controlling Lease. First, plaintiff contends that it is entitled to back rents because the Controlling Lease contains a provision that, plaintiff asserts, escalates defendants' rents based on the CPI. Second, plaintiff contends that it is entitled to collect 5.5% of any sums in excess of the base rents defendants may receive, which plaintiff argues includes 5.5% of all increases in the base rent. Third, plaintiff alleges that defendants have failed to pay rents associated with land that was created by partially filling in the Marina Lake during construction of the shopping center. Fourth, plaintiff contends that defendants are responsible for the cost of constructing a screening wall as required by the City of Wichita.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the prop-

er disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every ac-

tion." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

■ The construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.,* 255 Kan. 500, 511, 874 P.2d 659, 666 (1994). The "cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.,* 23 Kan.App.2d 30, 36, 926 P.2d 669, 674 (1996) (citing *Hollenbeck v. Household Bank,* 250 Kan. 747, 751, 829 P.2d 903, 906 (1992)). Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. *Simon v. Nat'l Farmers Org., Inc.,* 250 Kan. 676, 679–80, 829 P.2d 884, 887 (1992). Correspondingly, extrinsic evidence of the parties' intent is admissible when the terms of an agreement are ambiguous.

■ Whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire & Cas. Co.,* 265 Kan. 317, 324, 961 P.2d 1213, 1219 (1998). The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the

contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kan. Corp.,* 249 Kan. 746, 749, 822 P.2d 64, 67 (1991).

## A. Rent Escalation Based Upon CPI

Plaintiff argues that the Controlling Lease provides for a rental escalation based upon the CPI. Upon review of the Controlling Lease, the court finds conspicuously absent any provision stating that the rents due and owing by defendants will increase in accordance with the CPI. Rather, the only reference to the CPI is contained at the conclusion of Paragraph 5 of the Controlling Lease. Paragraph 5 governs the rental rates for any additional land upon which defendants may encroach in filling what was originally lake land.[2] The end of Paragraph 5 reads, "The cost-of-living provision will not apply to this paragraph."

Plaintiff argues the obvious inference is that the cost of living provision will apply to other paragraphs of the Controlling Lease. Plaintiff submits that the cost of living provision referenced in Paragraph 5 comes from the Original Leases, which preceded the Controlling Lease. Those Original Leases, which plaintiff argues remain in effect and were assigned to plaintiff when it acquired the property, contained a provision escalating rent based upon the CPI. Plaintiff contends that the CPI provisions contained in the Original Leases are not inconsistent with any provision in the Controlling Lease and that, since the Controlling Lease makes specific reference to the CPI provision, the CPI provisions are still in full force and effect.

The court begins its analysis by looking to the Controlling Lease itself, which contains the following provision:

> would need to be filled in order to construct Marina Lakes Shopping Center.

**2.** At the time the Controlling Lease was executed, the parties' predecessors reached an agreement that a portion of Marina Lake

37. CONTROLLING INSTRUMENT. It is agreed by and between these parties, that this instrument shall be the sole and controlling instrument effecting the rights and obligations of the parties hereto.

■ This clause states in clear and unambiguous terms that the Controlling Lease is the sole and controlling instrument governing the rights and obligations of the parties with respect to the property at issue.

In Section Two of the Controlling Lease, entitled "RENT," the base rental for the Marina Lakes property is established with reference to the prior leases with Bledsoe. Specifically, the Controlling Lease references the March 1, 1968, September 30, 1968, and May 13, 1971 leases by stating that: 1) "Lessee covenants and agrees to pay lessor as rent *for the property described in* the March 1, 1968 lease," 2) "Lessee covenants and agrees to pay lessor as rent *for the property described in* the September, 1968 lease," and 3) "Lessee covenants and agrees to pay lessor as rent *for the property described in* the May 13, 1971 lease." (Controlling Lease, § 2(A), (B), & (C) (emphasis added)). The annual rent is then set forth for each tract of land covered by those original leases. The court finds significant the fact that the Controlling Lease references the Original Leases *only with respect to* describing the tracts of property at issue.

Moreover, in Section Three of the Controlling Lease, entitled "ADJUSTMENTS TO RENT," there is absolutely no mention of a rental increase based on the CPI, nor is there any reference to the Original Leases. Rather, Section Three contains an additional rental provision that adjusts rent based on 5.5% of the overages that the lessee may receive from subtenants. Had the parties intended to incorporate CPI rental escalations from the Original Leases into the Controlling Lease, they would have done so expressly in this section, as they did with the base rental provision in Section Two. The fact that the parties did not incorporate the Original Leases, or the CPI provision contained in those leases, into the rental adjustment section of the Controlling Lease is evidence that the parties did not intend to incorporate into the Controlling Lease the prior CPI escalation provisions.

As additional support, the court points out that the Controlling Lease sets forth that adjustments to rent are to be made according to overages. Notably, the Original Leases did not contain a provision allowing for an adjustment to rent based on overages. Rather, the only way the Original Leases allowed for adjustments to the base rent was based upon the CPI. The only logical presumption is that the parties intended to replace the manner in which rental adjustments were made from adjustments based on the CPI to adjustments based on overages. To hold otherwise would require the court to read the Controlling Lease as containing *two* additional rent clauses, one of which contains no language indicating when or by whom the increases are to be calculated. Furthermore, the Controlling Lease contains no language indicating whether the two additional rent provisions, one based upon the CPI and one based upon overages, are related and, if so, how.

The court, however, cannot ignore the Controlling Lease's reference to the "cost-of-living provision." At best, the language excluding the cost-of-living provision from lake-filled property renders the contract ambiguous. As such, the court will look to extrinsic evidence to ascertain the intent of the parties.

■ Before the present dispute arose, the parties (and their predecessors in interest) operated under the Controlling Lease for 28 years. Under Kansas law,

subsequent conduct of parties to a contract may aid interpretation of controversial provisions. *Heyen v. Hartnett*, 235 Kan. 117, 123, 679 P.2d 1152, 1157 (1984). "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight in determining the meaning to be attributed to the provisions in question." *Id.* (citing *Cline v. Angle*, 216 Kan. 328, 532 P.2d 1093 (1975)).

█ It is undisputed that, for the 28 years following the execution of the Controlling Lease, neither Hanson nor its successor paid rental adjustments based upon the CPI. More importantly, during that 28 years, Clear Lake never demanded payment for rental escalations based upon the CPI. Had the parties intended the CPI provision to be included in the Controlling Instrument, surely Clear Lake, an original party to the agreement, would have sought a rental adjustment based upon the CPI.

As further evidence of the parties' intent based on subsequent conduct, defendants point to two estoppel certificates executed by Clear Lake, defendant WSCA (or its predecessor Hanson), and certain sub-tenants. One such certificate between Clear Lake, Hanson, and the F.W. Woolworth Company was executed soon after the Controlling Instrument was signed (Woolworth Attornment Agreement). The Woolworth Attornment Agreement states in pertinent part:

> WHEREAS, the Overlease has been at all times since its commencement date, and now is, in full force and effect and no default has occurred, either in the payment of rent or in the performance of any other covenant of the Lessee thereunder;

(Woolworth Attornment Agreement Recitals at 1). Another such certificate between defendant WSCA, Clear Lake, and Payless Shoesource, Inc. (Payless) was executed in October 1994 (Payless Consent to Sublease). Like the Woolworth Attornment Agreement, the Payless Consent to Sublease certifies that no breach has occurred with respect to the Controlling Lease. Specifically, the Payless Consent to Sublease states in relevant part:

> [Clear Lake] consents to the execution and delivery of the Sublease and represents that the [Controlling Lease] is in full force and effect and that, as of the date hereof, no default has occurred under the [Controlling Lease] nor has the [Controlling Lease] been amended.

(Payless Consent to Sublease § 1, *Full Force and Effect*). The execution of both the Woolworth Attornment Agreement and the Payless Consent to Sublease evidences that, for more than two decades, Clear Lake did not consider Hanson or its successor WSCA in breach of the Controlling Lease for failure to pay any CPI rental increase. To the contrary, the fact that Clear Lake executed certificates explicitly stating the Controlling Lease had not been breached, even though a CPI rental adjustment had never been paid, shows that the parties never intended that the base rent would be adjusted based upon the CPI.

Interestingly, the Payless Consent to Sublease also includes the following provision:

> [Clear Lake] also covenants and represents that a number of leases, as identified on Exhibit A [3] attached hereto and incorporated herein by this reference, have been superseded, cancelled and/or consolidated into the [Controlling Lease]

---

**3.** Exhibit A identifies the leases between Clear Lake and Bledsoe dated March 1, 1968, December 5, 1969, September 30, 1968, and May 13, 1971.

as herein defined and said prior leases are of no further force and effect.

(Payless Consent to Sublease § 1, *Full Force and Effect*). This clause further supports the inference that the parties intended that the Original Leases, and the CPI provisions contained therein, do not govern the current relationship between the parties.

Faced with this overwhelming evidence that the parties did not intend to adjust the base rent based upon the CPI, the court can only conclude that the provision excluding the CPI provision from lake-filled land was an inadvertent oversight. The court's conclusion is supported by the deposition testimony of John Frieden, the only surviving negotiator of the Controlling Lease. Mr Frieden, who represented Hanson, testified that the inclusion of a CPI provision was discussed during negotiations and that Hanson would not agree to such a provision. (Frieden Dep. at 29). Frieden further testified: "[The CPI provision] was a deal buster. The deal would not have been made. And they compromised, they substituted this overage clause that they have in the lease." (*Id.* at 30). Asked what the cost-of-living provision in the Controlling Lease refers to, Mr. Frieden responded: "I've thought about that, and the only thing that I can come up with is that the provision almost had to be in a previous draft and, through oversight, was not stricken." (*Id.* at 40).

Plaintiff has failed to come forward with evidence sufficient to survive summary judgment on this claim. Plaintiff's claim rests solely on the clause excluding a cost-of-living provision from lake-filled land. However, the remaining language of the Controlling Lease and the parties' subsequent conduct convince this court that no reasonable finder of fact could conclude that the parties intended a CPI rent escalation provision to apply to the rents set forth in the Controlling Lease. Defendants are entitled to summary judgment.

**B.  Overages**

Section Three of the Controlling Lease contains a provision that adjusts rent based upon overage payments received by defendants from subtenants of the shopping center. Pursuant to this provision, defendants must pay plaintiff 5.5% of all monies received from subtenants that are considered overages. Plaintiff alleges that, pursuant to the additional rent provision, it is entitled to collect 5.5% of all monies collected above the base rent, including 5.5% of all increases to the base rent. Section Three of the Controlling Lease states in pertinent part:

> Adjustments to Rent. The lessee agrees to pay and the lessor accepts as additional rent 5.5% of the overages that the lessee may receive from the subtenants over and above any base rent agreed to by and between the lessee and the subtenant. Overages are defined as any sums paid over the base rent and any increases in the base rent between lessee and sub-tenant .... The overage payment shall commence July 1, 1975, and shall be paid annually.

Plaintiff argues that the term "overages" is defined in the Controlling Lease as any amount received by defendants over and above the initial base rent, *including* increases in the base rents. Defendants contend that "overages" is defined as any amounts received in excess of the base rent, regardless of the amount by which the base rent may increase from time to time.

The court finds compelling both parties' interpretations of the term "overages." In other words, the clause defining "overages" can easily be interpreted to mean that defendants must pay 5.5% of any sums paid over the base rent, which includes any

increases in the base rent. On the other hand, if the phrase "over the base rent and any increases in the base rent" is interpreted as a compound prepositional phrase modifying "any sums paid," then "overages" could also be read to mean that defendants are obligated to pay 5.5% of any sums paid over both the base rent and increases in the base rent. Also, as defendants point out, if the intent of the parties had been to include increases in the base rent in the overage definition, it would have been unnecessary to include the phrase "increases in the base rent" because such increases would have naturally been considered to be a sum received "over" the base rent. Accordingly, the court finds the definition of "overages" to be capable of two meanings.

■ Because "overages" as defined in the Controlling Lease is ambiguous, the court looks to extrinsic evidence to determine the intent of the parties. As with the interpretation of the CPI provision, the court looks to the parties' 28–year history to ascertain whether the parties intended to include increases in the base rent in the overage definition.

There is no dispute that, since the execution of the Controlling Lease, defendants and its predecessor have paid additional rent only on those occasions where actual overage rents were received from subtenants in excess of the base rent and in excess of increases in the base rent. For example, from 1983 through 1989, and 1992 through 1999, defendants paid Clear Lake 5.5% of all amounts received from Furrs Cafeteria, over the base rent as it may have been set per the sublease from time to time. Defendants did not pay Clear Lake any amount of additional rent based upon increases to the base rent. More importantly, Clear Lake never demanded such additional rent.

As further evidence of the parties' subsequent conduct, the court looks to two subleases executed by defendant WSCA. On January 7, 1992, defendant WSCA entered into a lease for shopping center space to the Wichita Public Library (WPL Lease). Pursuant to the terms of the WPL Lease, the base rent was set at $1,307.00 per month. Since that time, the WPL Lease has been renewed eight times, and by the year 2000, the base rent had increased to $2,000.00 per month. Defendants have not paid, nor did Clear Lake ever demand, additional rents based on the increase in base rent paid by the Wichita Public Library.

Similarly, on September 23, 1994, defendant WSCA leased commercial space to Payless (Payless Lease). The term of the Payless Lease was ten years, with two renewal options for five years each. Increases in the base rent were set forth in the Payless Lease and were to occur on a graduated basis throughout the life of the lease. Since 1994, the base rent paid by Payless has increased twice. Payless now pays $437.50 per month more than it paid at the time the Payless Lease was executed. At no time during the term of the Payless Lease did Clear Lake demand from defendants any additional rent, despite the fact that defendants were obtaining periodic increases in the base rent from Payless. Moreover, after the Payless Lease was executed, the parties executed the Payless Consent to Sublease, wherein Clear Lake explicitly consented to the Payless Lease.

The parties' conduct for 28 years following the execution of the Controlling Lease demonstrates that the parties did not intend the term "overages" to include increases in base rent. Defendants never paid 5.5% of any increases in base rent and, significantly, Clear Lake never demanded any such payments, even when Clear Lake clearly had knowledge of base rent increases. The court concludes that

the parties intended "overages" to be defined as only those monies received in excess of both the base rent and any increases in base rent. The court grants summary judgment to defendants on this claim.

### C. Fence Requirement

■ Plaintiff alleges that defendants are required to construct a screening wall on the southern border of the Marina Lakes property to separate the Marina Lakes development from a residential development located to the south of Marina Lakes. Defendants argue that no requirement for a screening wall on the leased premises exists. Plaintiff's allegations implicate the following provision contained in the Controlling Lease: "FENCING, MAINTENANCE OF LAKE AND USE. It is further agreed that lessee will provide appropriate fencing *as required by city and county authorities.*" (emphasis added).

The City of Wichita (the City) has determined that plaintiff, as the owner of the property leased to defendants, is in violation of Community Unit Plan (CUP) DP–23, dated May 10, 1998. CUP DP–23 requires a five-foot to eight-foot high solid or semi-solid wall constructed of brick, stone, masonry, architectural tile or other similar material to be constructed along Parcel 1, property owned by plaintiff and leased to defendants.

Defendants argue that the City is mistaken in its determination that a screening wall is required on Parcel 1. Defendants direct the court's attention to the original CUP, dated March 30, 1971. Defendants contend that the original CUP provides that the screening wall should be constructed on Parcel 7, now subdivided into Parcels 7, 8, 9, and 10, property not owned by plaintiff or held under lease by defendants. According to defendants, the City Planning Department did not utilize the original CUP during the Planning Department's analysis of the screening wall requirement set forth in CPU DP–23. Defendants assert that, as a result, the City has wrongly determined that a screening wall should be built on Parcel 1 and that, rather, a screening wall should be built on Parcels 8 and 9 (formerly parcel 7). Apparently, both plaintiff and defendants have made attempts to convince the City that a screening wall is not required to be constructed on Parcel 1.

Notwithstanding defendants' argument that the City should not require a screening wall to be built on Parcel 1, the fact remains that the City has made its determination of what it deems appropriate under CUP DP–23. This case does not involve the City, and a decision by this court regarding whether the City rightly or wrongly determined that Parcel 1 requires a screening wall is not proper. Rather, the only concern for this court is to interpret the Controlling Lease and determine the rights and obligations of the parties thereunder.

As such, the court concludes that the Controlling Lease is unambiguous in setting forth defendants' obligation to provide appropriate fencing as required by the City. As long as the City requires that a screening wall be built on Parcel 1, defendants are contractually obligated to provide such a screening wall. Accordingly, plaintiff is entitled to summary judgment on this claim. Defendants are hereby ordered to construct sufficient fencing in and around the property at issue as required by the City or, alternatively, to pay plaintiff any such costs plaintiff may incur in constructing such fencing.

### D. Lake–Filled Land

Plaintiff asserts that defendants owe plaintiff additional rents for lands created through a lake-fill process undertaken by

Hanson pursuant to the terms of the Controlling Lease. Section 5 of the Controlling Lease states:

PAYMENT FOR LAKE FILL IN. It is agreed by all the parties that lessee shall have the right to extend the fill beyond the boundaries of the leased premises and onto property owned by lessor, not to extend more than 125 feet. Lessee agrees to pay the lessor the sum of $3,000.00 per year beginning August 1, 1972 for the first ten years and $2,500.00 per year thereafter for the term of this lease for this additional leased area. In the event a portion greater than 125 feet of the property not now under lease by the Hanson Development Company is used for fill purposes and it becomes necessary to extend onto premises in excess of 125 feet, then the rental for this additional leased premises which is in excess of 125 feet shall be computed on the basis of $3,000.00 per year per acre.

There appears to be no dispute that, when doing the landfill necessary to prepare the leased land for construction, Hanson extended the area of fill-in beyond the leased premises, but less than 125 feet.

Defendants contend that plaintiff does not own the parcel of land upon which plaintiff now seeks to collect past due rent. Plaintiff does not dispute this contention. Neither party has clearly articulated to the court the circumstances surrounding the ownership of the parcel of land in dispute, which is apparently Parcel 11. As best the court can discern from the record, when Clear Lake sold the Marina Lakes Shopping Center to plaintiff in May 2000, Parcel 11 was not included in the sale. Rather, it appears from an affidavit of Ted Hill, officer and shareholder of Clear Lake, that Clear Lake retained ownership of Parcel 11. However, at the time of the sale, Mr. Hill assigned to plaintiff Clear Lakes's rights, title, interest, causes of action, claims, benefits, and liabilities under the Controlling Lease. Mr. Hill further stated:

In so doing, it was my intent to assign to [plaintiff] all rights under the Lease of the Property ... including, but not limited to ... the right to collect past rent on additional space pursuant to Paragraph 5 of the Lease. However, it was *not* my intent to assign to [plaintiff] the right to collect rents on property retained and owned by Clear Lake on and after May 5, 2000. Specifically, it was not my intent to assign the right to collect additional rents occasioned by the "filling in" of the lake located on property retained by Clear Lake, if any be due after May 5, 2000.

(Hill Aff. ¶ 6). Thus, the court infers from Mr. Hill's affidavit that Clear Lake assigned any cause of action it may have had for past due rents on Parcel 11 up until May 5, 2000, but that Clear Lake reclaimed that right to additional rents due after May 5, 2000 "on property retained and owned by Clear Lake," which the court presumes includes Parcel 11.

█ Thus, it appears there was a valid assignment from Clear Lake to plaintiff of any cause of action to collect additional rents on lake-filled property from the inception of the Controlling Lease until May 5, 2000. Clear Lake possessed that right and assigned that right to plaintiff. As such, the fact that plaintiff does not currently own Parcel 11 is legally insignificant. Rather, plaintiff owns the right to assert Clear Lakes's cause of action. However, as an assignee, plaintiff merely stepped into the shoes of Clear Lake. In other words, plaintiff acquired no greater rights from the assignment than those possessed by Clear Lake, and plaintiff is subject to any defenses which could have been asserted against Clear Lake. *OXY USA, Inc. v. Colo. Interstate Gas Co.*, 20 Kan.

App.2d 69, 79–80, 883 P.2d 1216, 1223 (1994).

The court now turns to whether defendants are liable for additional rents on any lake-filled property which may have extended past the leased premises. Defendants argue that plaintiff's claim is barred by the doctrine of waiver. The court agrees.

Waiver implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. Waiver is consensual in nature, but the intention may be inferred from conduct. *Schraft v. Leis,* 236 Kan. 28, 36, 686 P.2d 865, 873 (1984). The court concludes that Clear Lake waived its rights, both expressly and implicitly, to collect additional rents.

Defendants submit the uncontroverted testimony of John Frieden. Mr. Frieden testified that, shortly after the lake-fill process was completed, the parties' predecessors agreed that no additional rents were due pursuant to the lake-fill provision of the Controlling Lease. In response to questions concerning the lake-fill provision contained in Section 5, Mr. Frieden testified:

> After the project had been completed and filled, the Clear Lakes people, together with the Hanson Development Company representatives, made a determination that there was nothing due under that provision. And my recollection is that Mr. Hill had retained an engineer, but notwithstanding that, in a conversation I had with Mr. Hill, I was advised that Clear Lakes, Inc., did not believe that the provision ever became operative and would not be making a claim for rent under it.

(Frieden Dep. at 56–57). The substance of Mr. Frieden's testimony is supported by the fact that Clear Lake never made any demand on Hanson or defendants for any rents due pursuant to lake-filled land that extended beyond the leased premises. Thus, immediately following the execution of the Controlling Lease, and for 28 years thereafter, Clear Lake unquestionably exhibited conduct consistent with a waiver of this contractual right. In short, Clear Lake waived whatever right it had to collect rent under Section 5. Defendants are entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that plaintiff's Motion for Summary Judgment (Doc. 24) and defendants' Motion for Summary Judgment (Doc. 26) are granted in part and denied in part. Specifically, the court grants summary judgment to plaintiff on Count III.[4] Defendants are ordered to construct sufficient fencing in and around the property at issue as required by the City or, alternatively, to pay plaintiff any such costs plaintiff may incur in constructing such fencing. The court grants summary judgment to defendants on all other claims. Having resolved all substantive issues in the instant action, this case is hereby dismissed.

---

4. As set forth in the Pretrial Order.